**EXHIBIT A**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FAITH CENTER CHURCH          )
EVANGELISTIC MINISTRIES,     )
et al.,                      )
                             )
            Plaintiffs,      )
                             )
     vs.                     ) Case No. C04-3111 JSW
                             )
FEDERAL D. GLOVER, et al.,   )
                             )    ORIGINAL
            Defendants.      )
                             )


DEPOSITION OF

ANNE CAIN

————————————

July 15, 2008


Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)


REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#411108]

**M E R R I L L   L E G A L   S O L U T I O N S**

135 Main Street, 4th Floor
San Francisco, CA 94105

415.357.4300 Tel

www.merrillcorp.com/law

I N D E X

INDEX OF EXAMINATIONS

EXAMINATION BY MR. CHANDLER ........................  4

EXHIBITS MARKED FOR IDENTIFICATION

Exhibit 1   Resolution No. 92/794 of the Contra
            Costa County Board of Supervisors ........  7

Exhibit 2   Resolution No. 93/525 of the Contra
            Costa County Board of Supervisors ........ 10

Exhibit 3   Recommendation to the Contra Costa County
            Board of Supervisors from Anne Cain,
            dated December 14, 2004................... 12

Exhibit 4   Resolution No. 2004/655 of the Contra
            Costa Board of Supervisors............... 13

Exhibit 5   Application and Permit for Use of
            Meeting Room by Melissa S. Robinett,
            dated December 20, 2007.................. 22

Exhibit 6   Application and Permit for Use of
            Meeting Room by Veronica Hein, dated
            February 16, 2008........................ 25

Exhibit 7   Application and Permit for Use of
            Meeting Room by Nick Busbee, dated May 5,
            2004..................................... 28

Exhibit 8   Application and Permit for Use of
            Meeting Room by Patrick Logan, dated March
            2005..................................... 30

Exhibit 9   Letter from Anne Cain to Hattie Hopkins,
            dated December 5, 2007................... 53

                          --oOo--

                                                                2

1                    --oOo--

2           Deposition of ANNE CAIN, taken by the

3      Plaintiffs at 651 Pine Street, 9th Floor, Martinez,

4      California, commencing at 9:01 a.m. on July 15, 2008,

5      before CAROLYN M. MANN, CSR, pursuant to Notice.

6                    --oOo--

7              A P P E A R A N C E S

8      FOR THE PLAINTIFFS:

9              ALLIANCE DEFENSE FUND

               101 Parkshore Drive

10             Suite 100

               Folsom, California  95630

11             BY:  TIMOTHY D. CHANDLER

                   JOEL OSTER

12

       FOR THE DEFENDANTS:

13

               CONTRA COSTA COUNTY

14             OFFICE OF THE GENERAL COUNSEL

               651 Pine Street

15             Ninth Floor

               Martinez, California  94553-1229

16             BY:  THOMAS L. GEIGER

17                   --oOo--

18

19

20

21

22

23

24

25

                                                          3

1                    MARTINEZ, CALIFORNIA

2                  TUESDAY, JULY 15, 2008

3                       9:01 A.M.

4                        --oOo--

5                       ANNE CAIN

6                    _____

7       called as a witness, who, having been first duly sworn,

8       was examined and testified as follows:

9                        --oOo--

10                 EXAMINATION BY MR. CHANDLER

11           MR. CHANDLER:   Q.   Good morning, Miss Cain.

12      Have you had your deposition taken before?

13           A.    Yes.

14           Q.    Okay.  So you kind of know how this works?

15           A.    Yes.

16           Q.    You were just sworn in, so everything you say

17      is under oath as though you were testifying in court.

18                 I'm going to ask you a series of questions.

19      Answer them to the best of your knowledge.  If you don't

20      know, say so.  I'll try to keep my questions as clear

21      and concise as possible, but if you don't understand

22      something, feel free to ask me to clarify.

23                 Your attorney may object to some of my

24      questions, and unless he advises you not to answer, go

25      ahead and answer it if you understand it.

4

1    Your answers should be clear and audible.  The

2  court reporter is recording everything that we say, so

3  don't nod or shake your head or say "uh-huh" or

4  "huh-uh."  "Yes" or "no," and we'll try to avoid talking

5  over each other so that she can get a clear transcript

6  of everything we say.

7    If at any point you need to take a break, just

8  let me know; that's not a problem.

9    Do you have any questions before we start?

10    A.    No.

11    Q.    Okay.  Could you state your name and spell it

12  for the record, please.

13    A.    Anne, A-N-N-E, Cain C-A-I-N.

14    Q.    And besides your attorney, did you discuss

15  this deposition with anybody?

16    A.    I talked with one of my deputy county

17  librarians, Laura O'Donoghue, on Thursday.

18    Q.    And what did you discuss?

19    A.    I told her that I had talked with Tom and that

20  I was going to be out of town Friday and Monday, and

21  that I thought Tom would give her a call.  And that's

22  about it.  We had some questions from some of the other

23  staff that you're going to be talking to, and so I had

24  told her that Tom was going to give them a call as well.

25    Q.    And what were those questions that the staff

5

1   had asked you?

2       A.   I don't know.  I don't know.  People -- I had

3   turned over to my secretary the information to schedule

4   the appointments, the times with everybody, and word got

5   back to me that there were some questions.  Some of them

6   were, Where is the deposition?, and that kind of thing.

7       Q.   Did anybody ask about what we might be asking

8   about in the deposition?

9       A.   Not to me.

10      Q.   Did you review any materials in preparation

11  for this deposition?

12      A.   No.

13      Q.   Where are you currently employed?

14      A.   Contra Costa County.

15      Q.   And how long have you been employed by the

16  County?

17      A.   Nineteen years.

18      Q.   And what is your current job title?

19      A.   County librarian.

20      Q.   And how long have you been in that position?

21      A.   About 10 years.

22      Q.   What are your primary job duties as the county

23  librarian?

24      A.   I manage the county library, provide the

25  leadership for the county library, plan for the future

6

1    of library service.  We have 25 libraries in the

2    communities throughout the county, and we provide local

3    library service through those.

4         Q.   Are you the senior librarian for the entire

5    county?

6         A.   Yes.

7         Q.   For all 25 libraries?

8         A.   (Nods head.)

9         Q.   Are you responsible for the operation of all

10   25 libraries?

11        A.   Yes.

12        Q.   Do you implement the policies that govern

13   those libraries?

14        A.   Yes.

15        Q.   Do you recommend new policies to the governing

16   board?

17        A.   Yes.

18        Q.   Let's talk about the library meeting room use

19   policy for the county as it relates to the Faith Center

20   case.  You are familiar with the Faith Center

21   litigation?

22        A.   Yes.

23             MR. CHANDLER:  Mark this as Exhibit 1.

24             (Deposition Exhibit 1 was marked for

25             identification.)

7

1          MR. CHANDLER:   Q.   If you could take a look at

2    what has been marked as Exhibit 1 and tell me if you

3    recognize that document.

4          A.    Yes.

5          Q.    What is it?

6          A.    It is an older version of the meeting room

7    policy.

8          Q.    Is this the meeting room policy that was in

9    effect when Faith Center first met in the Antioch

10   library meeting room?

11         A.    I don't know.  I don't remember when it was

12   changed.

13         Q.    Do you recall what the, the -- at the time

14   that Faith -- do you recall when Faith Center initially

15   met in the Antioch library?

16         A.    Do you mean do I recall that it happened, or

17   do I recall the date?

18         Q.    Yes, do you recall when it happened, or that

19   it happened?

20         A.    Yes, I recall that it happened.

21         Q.    And do you recall what the meeting room policy

22   was at that time regarding religious use?

23         MR. GEIGER:   I'm going to object on vagueness.

24   I mean, if you have a date, that would be helpful.

25         MR. CHANDLER:   Q.   Do you recall the date that

1   Faith Center initially met?

2       A.   No.

3       Q.   Was it in 2004?

4       A.   It could have been.

5       Q.   Do you remember what --

6       A.   But I, I mean, if you asked me if it was 2003,

7   2005, I honestly don't know.

8       Q.   Okay.  Do you recall what the meeting room

9   policy was at the time that they initially met --

10      A.   No.

11      Q.   -- regarding religious uses?

12      A.   No.  This has changed a few times, and I don't

13  recall exactly when it changed, and I don't recall how

14  that fits with when they used the meeting room.

15      Q.   In the top right corner of this document it

16  says that it was -- it says "Revised:  March 2000."

17  Does that indicate the last time that this document had

18  been revised?

19      A.   It should.

20      Q.   So in March 2000, this, the policy as written

21  was put into effect up until -- it hadn't been changed

22  at that point, or at any point since March 2000; is that

23  right?

24              MR. GEIGER:  Do you understand the question?

25              THE WITNESS:  I think I understand the

9

1    question.  I remember an earlier version of this, and

2    I'm not sure when it changed to be this.  And then I

3    remember that this has also changed.

4            MR. CHANDLER:  Q.  Okay.  Let me ask it a

5    different way.  I realize that wasn't a very clear

6    question.

7            Every time a meeting room policy is changed,

8    does the -- is that reflected in the revision date?

9        A.   It should.

10       Q.   Okay.  Do you recall if the meeting room

11   policy was changed shortly after the Faith Center

12   lawsuit was filed?

13       A.   I don't recall.

14       Q.   What does the -- in Exhibit 1, what does the

15   religious use provision restrict?

16       A.   Religious purposes.

17       Q.   So no meetings were allowed that were for

18   religious purposes; is that right?

19       A.   That should be right.

20           MR. CHANDLER:  Mark this as Exhibit 2, please.

21           (Deposition Exhibit 2 was marked for

22           identification.)

23           MR. CHANDLER:  Q.  All right.  The court

24   reporter has handed you what's been marked as Exhibit 2.

25   Do you recognize this document?

10

1       A.    Yes.

2       Q.    And can you tell me what it is?

3       A.    It's a, it's another version of the policy on

4    the use of meeting rooms.

5       Q.    And when was this policy revised?

6       A.    August 2004.

7       Q.    And was the religious use aspect of the policy

8    changed?

9       A.    Yes.

10      Q.    Do you recall making a recommendation to the

11   board of supervisors to make that change to the

12   religious use policy?

13      A.    Probably, although it's interesting; I, I'm --

14   my memory was that this was the earlier one and this was

15   the revision, but I see that I'm not even clear on that.

16      Q.    When you say, when you say "this," which

17   document are you referring to?

18      A.    I'm sorry.  The "religious services and

19   activities" versus "religious purposes."  And I'm also

20   wondering why one of these says November 1992 and the

21   other August 1993.

22      Q.    Do you recall making a change to the policy in

23   August 2004?

24      A.    I remember making a change to the policy.  I

25   couldn't tell you the date that we changed it.

Merrill Legal Solutions
(800) 869-9132

1     Q.   Do you know if the change to the religious use

2  section of the policy was the only change in the policy

3  that was made at that time?

4          MR. GEIGER:  Objection, vague.  Which time?

5          MR. CHANDLER:  Q.  The, the August 2004, the

6  Exhibit 2, you noted earlier that the religious use

7  aspect of the policy had been changed.  Was that the

8  only change that was made in August of 2004 when you --

9     A.   As far as I know, yes.

10          (Deposition Exhibit 3 was marked for

11          identification.)

12          MR. CHANDLER:  Q.  All right.  The court

13  reporter is now handing you what's been marked as

14  Exhibit 3.  Do you recognize this document?

15     A.   Yes.

16     Q.   What is it?

17     A.   It is a board order recommending a change in

18  the meeting room policy.

19     Q.   And did you submit this --

20     A.   Yes.

21     Q.   -- recommendation?

22          And on -- is the second page the recommended

23  change to the policy?

24     A.   Yes.

25     Q.   And what did you recommend changing in the

12

1    meeting room policy when you submitted this particular

2    form?

3             MR. GEIGER:  You know, the document speaks for

4    itself under the "Recommendation" section.

5             But you can go ahead and answer.

6             THE WITNESS:  Changing "religious services or

7    activities" to religious, just "religious services."

8             MR. CHANDLER:  Q.  And do you recall if there

9    were any other changes to the policy made when this was

10   submitted?

11        A.    I don't think so.

12        Q.    And this change was -- was this unanimously

13   approved by the board?

14        A.    Yes.

15             (Deposition Exhibit 4 was marked for

16             identification.)

17             MR. CHANDLER:  Q.  The court reporter is

18   giving you what's been marked as Exhibit 4.  Do you

19   recognize this document?

20        A.    Yes.

21        Q.    And what is it?

22        A.    Isn't it the same as the attachment to this

23   document, to Exhibit 3?  Which is the policy that the

24   board approved.

25        Q.    Is the religious -- or I'm sorry.  Is the

                                                        13

1   revision date in the top right corner different than

2   Exhibit 3?  Is it different in Exhibit 4 than it is in

3   Exhibit 3?

4        A.    There's no revision date on Exhibit 3.  I

5   mean, there's nothing on the top right-hand corner.

6        Q.    When was that, the revision in Exhibit 3 made?

7   Is there a date anywhere in Exhibit 3 that can tell us?

8        A.    Looks like December 14th, 2004.

9        Q.    And Exhibit 4 says it was revised in

10  March 2007; is that correct?

11       A.    I don't know that that means that the policy

12  was revised.  I'll tell you, one of the things I noticed

13  with the policy and procedure manual is they sometimes

14  put in just the date that they redid it.  I don't see a

15  change here.  This doesn't look to me like it was

16  revised in March of 2007.

17       Q.    Do you recall after December 14th, 2004, when

18  Exhibit 3 was enacted by the board, do you recall any

19  changes to the meeting room use policy since that time?

20            MR. GEIGER:  Just to clarify, by "meeting room

21  use policy," you mean Resolution 2004/655?

22            MR. CHANDLER:  Yeah, that's right.

23       Q.    The Resolution 2004/655 in Exhibit 3, have

24  there been any changes, to your knowledge, of the

25  meeting room use policy since that time?

                                                        14

1          MR. GEIGER:  Since December 14th, 2004?

2          MR. CHANDLER:  Yes, that's right.

3          MR. GEIGER:  Okay.

4          THE WITNESS:  I don't recall.  I think --

5          MR. GEIGER:  I think it's -- I can jump in

6     here.  I mean, you can look at the two and compare them

7     and . . . If you want to see if they're any different.

8          MR. CHANDLER:  Q.  Yeah, you can certainly

9     look at them.  And the other question I would have is

10    if, if the meeting room use policy was formally changed

11    as a result of the Faith Center lawsuit in any way.

12         A.   I think for a period of time we did allow

13    religious services during the, during the time of the

14    lawsuit.

15         Q.   Was it formally changed in the policy?

16         A.   I don't believe so.

17         Q.   Okay.  So, and this is all I'm wondering

18    about, is if the policy as written has stayed the same

19    since December 14th, 2004, or if there's been any

20    changes that have happened subsequent to, because these

21    are the only, these are the only copies of the policy

22    that I've seen.

23         MR. GEIGER:  And I'm going to object because,

24    just, the document speaks for itself, but go ahead.

25         THE WITNESS:  I don't -- I'm not aware of any,

                                                              15

1    any other changes.

2          MR. CHANDLER:   Q.   And that's all I was

3    looking for.   I just wanted to make sure that there

4    wasn't any.   It said "Revised:  March 2007."  I wanted

5    to see if there was a revision that took place.

6          Now, does Exhibit 4, the current meeting room

7    use policy, does this apply to all county libraries?

8          A.   No.

9          Q.   Which libraries does it apply to?

10         A.   It only applies to the meeting rooms that are

11   governed by the county policy.  Some of the libraries

12   that are owned by the cities, the cities manage the

13   meeting rooms and they have their own policies.

14         Q.   So as the county librarian, do you, do the

15   city libraries come under your supervision?

16         A.   Yeah, they're all county libraries, but we

17   have, we really have a partnership with the cities.  And

18   the cities are responsible for building the buildings,

19   and because they own the buildings in some cases, they

20   set up their own policies for the use of meeting rooms.

21         Q.   And approximately how many of the libraries

22   are city-owned, controlled?

23         A.   Well, there's a lot of different arrangements

24   for some of them, but about half of them.

25         Q.   About half?

1      A.    Some of them don't even have meeting rooms.

2    Some libraries don't have meeting rooms.

3      Q.    And the Antioch branch, is that a county

4    library or is that --

5      A.    Yes.

6      Q.    Are the -- as to the county library branches,

7    are they allowed to implement their own rules for using

8    their meeting rooms?

9          MR. GEIGER:   Can I -- just to clarify, do you

10   mean county-owned libraries?

11         MR. CHANDLER:   Q.   The, the half or so that

12   you said are owned and operated by the county that you

13   don't have the arrangement with the city.

14     A.    Well, they're all operated by the county.

15     Q.    The ones that --

16     A.    And it's not really half/half are owned by the

17   cities, but we have some that are in schools, we have

18   some that are owned by -- one that's owned by a

19   corporation.  But maybe you're asking about the ones

20   that do fall under this policy.

21     Q.    Yeah, and it's just, I think, a matter of me

22   understanding the arrangements.  So this, this

23   particular policy applies to about half of the

24   libraries, correct?

25     A.    It's less than that, I think, because some of

1    them don't have meeting rooms.

2         Q.    Okay.  And Antioch is one of those?

3         A.    Yes.

4         Q.    So as to the libraries that this, that

5    Exhibit 4 applies to --

6         A.    Uh-huh.

7         Q.    -- are those libraries allowed to implement

8    their own rules for how the meeting rooms are used?

9         A.    They have their own set of rules, but they all

10   have the same policy.  The rules tend to apply to things

11   like how far in advance you can reserve them, whether or

12   not, you know, there's tables and chairs and how they

13   get set up.  Those kind of rules exist for the meeting

14   rooms, and those are based on, you know, some

15   communities have a heavy usage so they can only use it

16   maybe once a month.  Those kinds of things are set by

17   individual rules at each, but the policy is the same.

18        Q.    Okay.  And how are the rules implemented?

19   Does each individual branch --

20        A.    When you say "rules," are you talking about

21   this policy?

22        Q.    No, let me clarify that, because you had said

23   this was the policy --

24        A.    Uh-huh.

25        Q.    -- and my understanding was that each branch

Merrill Legal Solutions
(800) 869-9132

1    sets up its own individual rules for how the meeting
2    room is, use is allowed or conducted.  But this is the
3    policy.
4          A.    Well, I wouldn't agree with you that they set
5    up their own rules for the meeting room use.  I mean, in
6    terms of what kinds of groups can use it, they all fit
7    under the same policy.  The difference would be in the
8    rules, would be whether or not a key is given out to a
9    group or whether they -- and whether they can use it
10   after hours, for example, because they have a separate
11   entrance.  Those are the kinds of rules.
12         Q.    So the rules are more how this policy is, the
13   Exhibit 4, is administered --
14         A.    Yes.
15         Q.    -- in the library; is that a fair
16   characterization?
17         A.    I wouldn't say how the policy is administered
18   because the policy is administered the same.  It's more
19   the logistics and practical kinds of issues.
20         Q.    Okay.  That makes sense.  And I'll, I will use
21   the term "rules" to refer to those, the logistics --
22         A.    Okay.
23         Q.    -- and the word "policy" to refer to --
24         A.    Okay.
25         Q.    -- Exhibit 4, just to try to keep the two --

1      A.    Okay.

2      Q.    -- clear.

3            So how are -- how do the individual libraries

4      enact the rules?  Do they just come up with them on

5      their own?  Do you approve them?  How is that -- what

6      does that process look like?

7      A.    You know, I'm not aware that -- I don't know.

8      They've been in place for a long time.  Trying to think

9      if there are any that have changed recently.  I, I guess

10     I would say that I don't approve them.  I mean, I can't

11     think of a time that somebody has come up to me and

12     said, Is it okay if we, you know, change the hours that

13     we allow people to use the meeting room?

14     Q.    So could an individual branch then create

15     rules that impose greater restrictions on the meeting

16     room usage than what is permitted in Exhibit 4?

17     A.    No.

18     Q.    So they couldn't -- as an example, for-profit

19     organizations are allowed to use a, a meeting room under

20     Exhibit 4, correct?

21     A.    For a fee, yes.

22     Q.    If -- so could a library, an individual

23     library say, We're only going to make our meeting rooms

24     available for nonprofit groups?

25     A.    No.

1    Q.   Could it broaden, could an individual library

2    broaden the restrictions that are in Exhibit 4?   For

3    example, could they, could an individual library drop

4    the prohibition on religious services --

5    A.   No.

6    Q.   -- and allow -- so as far as who may or may

7    not use the meeting rooms or what is allowed to be

8    discussed in the meeting rooms, all of the libraries

9    that fall under Exhibit 4 must follow this.

10   A.   Yes.

11   Q.   Okay.   I'd like to go back and discuss some

12   more of the specifics, specific restrictions within

13   Exhibit 4.   I'd like to start with the provision that's

14   entitled "Educational Use."   Could you please read that

15   provision into the record for us.

16   A.   "Library meeting rooms are available to

17   schools only for special meetings, programs, or

18   activities.   They may not be used for instructional

19   purposes as a regular part of the curriculum."

20   Q.   Can you describe for me what this provision is

21   intended to restrict?

22   MR. GEIGER:   Objection, the document speaks

23   for itself.

24   MR. CHANDLER:   Q.   Well, specifically, what,

25   what is your understanding of the meaning of the

21

1    "instructional purposes as a regular part of the

2    curriculum"?

3            MR. GEIGER:  I'm going to object again.  The

4    document speaks for itself.

5            MR. CHANDLER:  Q.  Do you understand the

6    question?

7        A.    Yes.

8            MR. GEIGER:  You can answer it.

9            MR. CHANDLER:  Q.  You can answer.

10       A.    They're not to be used for regular classes.

11           MR. CHANDLER:  Mark that as Exhibit 5.

12           (Deposition Exhibit 5 was marked for

13           identification.)

14           MR. CHANDLER:  Q.  The court reporter has

15   handed you what's marked as Exhibit 5.  Do you recognize

16   this form?

17       A.    Yes.

18           MR. GEIGER:  I'm going to object on relevance.

19           MR. CHANDLER:  I'm just trying to understand

20   the scope of the --

21           MR. GEIGER:  No, I understand.  I'm just

22   objecting on relevance grounds.

23           MR. CHANDLER:  Q.  Can you tell me which

24   library this application was for?

25       A.    Pinole.

                                                          22

1        Q.    And does the Pinole library fall -- is it

2    governed by Exhibit 4?

3        A.    Yes.

4        Q.    And what was this application for, what kind

5    of meeting?

6        A.    To prepare --

7              MR. GEIGER:  Sorry.  Objection, it speaks for

8    itself.

9              Go ahead.

10             THE WITNESS:  To prepare for the AP exam.

11             MR. CHANDLER:  Q.  And do you -- can you tell

12   me who applied to use the meeting room?

13       A.    Melissa Robinett.

14       Q.    And she is a teacher, correct?

15       A.    Yes.

16       Q.    And this meeting, or this use was approved?

17       A.    Yes.

18       Q.    So my question is with this, would this be

19   considered classroom instruction if they're studying for

20   AP exam?

21       A.    No.  I would approve this.  This to me does

22   not fit with this.  This is, this says, "Library meeting

23   rooms are available to schools only for special

24   meetings, programs, or activities.  They may not be used

25   for instructional purposes as a regular part of the

                                                          23

1    curriculum."

2         This was to prepare for the AP exam.  So I

3    would see that as fitting under "special meetings,

4    programs, or activities."  This isn't a request that the

5    AP biology class hold their class there.  This is a

6    special meeting to prepare for the AP exam.

7         Q.   Well, if the, if the, if the meeting took

8    place during regular school hours, would that make a

9    difference?

10        A.   No.

11             MR. GEIGER:  Objection, hypothetical.

12             MR. CHANDLER:  Q.  If the biology professor or

13   biology teacher here wanted to meet on a weekly basis

14   during school hours, would that make a difference?

15             MR. GEIGER:  Objection, hypothetical.

16             Go ahead.

17             THE WITNESS:  It would depend if the Pinole

18   library in their rules say that you can't meet more than

19   once a week or once a month.  I don't know what their

20   rules are.

21             MR. CHANDLER:  Q.  Assuming that they met all

22   the other rules, just as far as this, the educational

23   use provision in Exhibit 4 --

24        A.   No, as long as their purpose was to prepare

25   for the AP exam, they're not holding their biology class

                                                      24

1   there, they're holding a meeting to prepare for the AP

2   exam.

3        Q.   Well, is an AP biology class, to your

4   knowledge, intended to prepare students for an AP

5   biology exam?

6            MR. GEIGER:  Objection; asked and answered,

7   hypothetical.

8            THE WITNESS:  I see this as fitting under,

9   because I don't see it as an instructional purpose or as

10  part of the regular curriculum.  This is a special

11  meeting, and it doesn't matter whether they have it once

12  or three times or 10 times, I would see it as a special

13  meeting.

14           MR. CHANDLER:  Mark this as . . .

15           THE REPORTER:  Six.

16           MR. CHANDLER:  Six?

17           (Deposition Exhibit 6 was marked for

18           identification.)

19           MR. CHANDLER:  Q.  The court reporter is

20  handing you what's been marked as Exhibit 6.  Do you

21  recognize this document?

22       A.   Yes.  And --

23           MR. GEIGER:  And I'm going to object again on

24  relevance grounds.

25           THE WITNESS:  When you say, "Do you recognize

                                                        25

1   the document," I recognize -- the first time you asked

2   me this, you asked me if I recognized the form.  I do

3   recognize the form.  If you're asking me if I've seen

4   this document, this actual document, I can't say that I

5   have.

6          MR. CHANDLER:  Q.  Okay, and that's fair.  So

7   you do recognize the form.

8          A.   I recognize the form.

9          Q.   And can you tell me what the purpose of this

10  meeting was for that was on the form?

11         MR. GEIGER:  Objection, it speaks for itself.

12         THE WITNESS:  It's to practice for the mock

13  trial.

14         MR. CHANDLER:  Q.  And the applicant was

15  Antioch High School; is that correct?

16         A.   Yes.  It was a teacher at Antioch High.

17         Q.   And this use was approved?

18         A.   Yes.

19         Q.   Would you approve that use?

20         A.   Yes.

21         MR. GEIGER:  Objection, hypothetical.

22         MR. CHANDLER:  Q.  The mock trial team is a,

23  is a class at Antioch High School.  Would that change

24  your decision to approve it?  Would that fall under the

25  educational use restrictions in Exhibit 4?

1        A.    I would see this as, it says, "Library meeting

2    rooms are available to schools only for special

3    meetings, programs, or activities." I think preparing

4    for the mock trial, I would probably consider it a

5    special meeting, program, or activity.

6        Q.    Even if they're, even if there's a mock trial

7    class that's conducted at Antioch High School where they

8    teach --

9        A.    This doesn't say "class" anywhere on it.  So I

10   mean, I think -- we'd look at these for what they say on

11   them.  This looks, this would look to me, just looking

12   at it, to see that it's a special meeting program or

13   activity.

14       Q.    May students reserve it for study groups for

15   classes, reserve a meeting room to have a study group

16   for one of their school classes?  Would that fall under

17   the educational use restriction in Exhibit 4?

18       A.    I don't know, I don't know whether -- I'm not

19   sure whether individuals can or whether it has to be an

20   organization.

21       Q.    Is that a county-wide distinction that's in

22   Exhibit 4, or is that a library by library decision?

23       A.    I don't know.  I don't know.

24       Q.    Did you say earlier that you recommended the

25   board adopt Exhibit 4?

27

1    A.    Yes.

2    Q.    And you don't know if Exhibit 4 requires or

3    allows for an individual to apply for meeting room use.

4    A.    I mean, this says "nonprofit and civic

5    organizations, for-profit organizations, schools and

6    government organizations."

7    Q.    So does that -- is it your interpretation then

8    that individuals are not allowed to reserve a meeting

9    room?

10   A.    Yes.

11   Q.    If a, if the AP biology class students came in

12   and said, We're an AP biology class, would that count as

13   an organization in your understanding of how the, that

14   requirement is enforced?

15        MR. GEIGER:   Objection, hypothetical.

16        THE WITNESS:   I don't know.   You know, I can

17   tell you that probably if a group of students came into

18   the library and the meeting room was not in use and they

19   needed a quiet place to study, I wouldn't be surprised

20   if they were allowed to use the meeting room for that

21   purpose, but I don't know that.

22        MR. CHANDLER:   Exhibit 7.

23        (Deposition Exhibit 7 was marked for

24        identification.)

25        MR. CHANDLER:   Q.   The court reporter has

                                                          28

1   handed you what's marked as Exhibit 7.  Do you recognize

2   this form?

3            MR. GEIGER:  I'm going to object on grounds of

4   relevance again.

5            THE WITNESS:  I recognize the form, yes.

6            MR. CHANDLER:  Q.  And is this a student that

7   has applied or an individual that has applied to use the

8   meeting room for a study group?

9            MR. GEIGER:  Objection, the document speaks

10  for itself.

11           THE WITNESS:  That's what it looks to me, like

12  somebody has applied for this study group.

13           MR. CHANDLER:  Q.  And did they -- do you see

14  an organization indicated anywhere?

15       A.   "Study group."

16       Q.   Well, that's under the purpose of the meeting,

17  correct?

18       A.   Uh-huh.

19       Q.   Did they provide a name of an organization?

20       A.   It does not appear that they did.

21       Q.   So should -- would you approve this

22  application?

23           MR. GEIGER:  Objection, hypothetical.

24           THE WITNESS:  I don't know.  You know, you

25  should probably check with the people who did approve

                                                    29

1   it.  Maybe they had a conversation with them.  I

2   honestly don't know.

3           MR. CHANDLER:  Q.  Are the, are the individual

4   librarians allowed to make exceptions to the meeting

5   room policy?

6       A.   They shouldn't make exceptions to the policy,

7   no.

8       Q.   But if an individual student wanted to use a

9   meeting room for a study group and it wasn't in use,

10  would a librarian be okay to allow them to do that?

11      A.   I don't know that that's, I don't know that

12  that's an exception to the policy.

13      Q.   Well, did you say earlier that individuals are

14  not allowed to reserve a meeting room?

15      A.   Right.

16      Q.   So would allowing an individual to reserve a

17  meeting room to study for a class not fall within the

18  scope of what's allowed under the meeting room use

19  policy?

20      A.   You know, I don't know what the study group

21  is.

22           (Deposition Exhibit 8 was marked for

23           identification.)

24           MR. CHANDLER:  Q.  The court reporter has

25  handed you what's been marked as Exhibit 8.  Is this an

30

1    application from a student to use a meeting room for

2    study?

3         MR. GEIGER:  I'm going to object again on

4    relevance grounds, and I'm also going to object the

5    document speaks for itself.

6         THE WITNESS:  Yes.

7         MR. CHANDLER:  Q.  And this use was approved?

8    A.    Yes.

9    Q.    Does this -- would this use violate your

10   understanding of the meeting room use policy?

11   A.    Again, you'd have to check with the people

12   that approved it.  Maybe they had some conversation that

13   made them feel that it was within the policy.

14   Q.    So the librarians could determine the scope of

15   Exhibit 4 on their own?

16        MR. GEIGER:  Objection, vague.  By "scope," do

17   you mean whether it applies to a particular applicant?

18        MR. CHANDLER:  I'll withdraw the question.

19   Q.    You are the, the senior-most librarian within

20   the county, correct?

21        MR. GEIGER:  That's been asked and answered.

22        MR. CHANDLER:  Q.  You can answer.

23   A.    Yes.

24   Q.    If there is a question about the, about the

25   scope or the, how Exhibit 4 is to be interpreted, who in

31

1   the county would a library go to to find out how it

2   should be interpreted?

3        A.   An individual staff member would use the,

4   would ask the community library manager at that

5   location.  If they had a question, they would ask one of

6   the deputy county librarians, the one that supervises

7   their community library.  And if that person had a

8   question, they would ask me.

9        Q.   And if you had a question, is there anybody

10  that you would go to?

11       A.   Yes.  County counsel.

12       Q.   Okay.  So if a, if a, a deputy county

13  librarian -- is that the right term?

14       A.   Uh-huh.

15       Q.   If a deputy county librarian had a question or

16  came to you and asked you if an individual student could

17  use a meeting room for, to study for an exam, would you

18  tell them that that was within the scope of Exhibit 4 --

19            MR. GEIGER:  Objection.

20            MR. CHANDLER:  Q.   -- as you understand it?

21            MR. GEIGER:  Sorry to interrupt.  Objection,

22  hypothetical, and I need to let you finish.  Sorry.

23            THE WITNESS:  If they came and asked me if an

24  individual student -- I don't believe anybody's ever

25  asked me that.

                                                        32

1           MR. CHANDLER:  Q.  I'm asking you.  If they
2    did, what would you say?
3        A.    They probably couldn't use it under this
4    policy.  Could they use it as a place in the library for
5    quiet study?  I wouldn't have a problem with that.
6        Q.    And by "it" you mean the meeting room?
7        A.    Yes.
8        Q.    So the meeting room -- never mind.  Scratch
9    that question.
10          Let's go back to Exhibit 4.  I'd like to ask
11   you about the fee-based usage provision.  Can you
12   identify for me the requirements for using a meeting
13   room free of charge?
14          MR. GEIGER:  Objection, the document speaks
15   for itself.
16          THE WITNESS:  It says, "Nonprofit and civic
17   organizations, for-profit organizations, schools and
18   governmental organizations may use the meeting room for
19   a fee for meetings that are closed to the general
20   public, for which an admission fee is charged, or at
21   which soliciting or selling takes place."
22          MR. CHANDLER:  Q.  As to the requirement that
23   a meeting be closed to the general public, does the
24   meeting have to be made available to anybody in the
25   public that wants to attend in order to be, avoid the

                                                    33

1    fee?

2        A.    Yes.

3        Q.    So, for example, with Exhibit 5, that was the

4    AP biology class, was that, Exhibit 5, approved for a

5    no-fee usage?

6        A.    Yes.

7        Q.    Would you consider a study group for an AP

8    biology class open to the public?

9        A.    Yes.

10        Q.    So anybody, they would have to allow

11    anybody --

12        A.    Yes.

13        Q.    -- to come in and sit in on the --

14        A.    Yes.

15        Q.    -- meeting if they wanted to?

16              If a -- sorry.  Scratch that.

17              Does the event have to be of any public or

18    community interest?

19              MR. GEIGER:  Objection, the document speaks

20    for itself.

21              THE WITNESS:  It says "activities of

22    educational, cultural, or community interest."

23              MR. CHANDLER:  Q.  So studying for an AP

24    biology exam would fall under that definition --

25        A.    Yes.

                                                            34

1          Q.    -- as you understand it?

2          Is there any event that you can think of that

3    wouldn't fall under that definition?

4          MR. GEIGER:  Objection, vague.

5          THE WITNESS:  Yes.  I mean, you want me to

6    come up with something?  I can't come up with something,

7    but I can imagine that there would be things that don't

8    fit educational, cultural, or community interest.

9          MR. CHANDLER:  Q.  So in essence, to

10   understand this, that aspect of the policy then, and not

11   be closed to the general public, as long as they, as

12   long as a meeting keeps the doors open and anybody can

13   walk into it, that's enough to satisfy that regulation;

14   is that correct?

15         MR. GEIGER:  Objection.  Which aspect are you

16   talking about?

17         MR. CHANDLER:  Q.  The provision that says the

18   meeting may not be closed to the general public in

19   Exhibit 4.

20         MR. GEIGER:  Under the fee-based provision?

21         MR. CHANDLER:  Yes.

22         THE WITNESS:  Yes.

23         MR. CHANDLER:  Q.  Okay.  Let's talk about the

24   religious use aspect of the policy.  The current policy,

25   Exhibit 4, prohibits religious services, correct?

1        A.    Yes.

2        Q.    And how would you define religious services?

3              MR. GEIGER:   Objection, the document speaks

4        for itself.

5              THE WITNESS:   I wouldn't define it.   We just

6        use whatever people write on the form.

7              MR. CHANDLER:   Q.   So if an application is

8        submitted from a preacher who wants to give a sermon in

9        the meeting room, would that be considered a religious

10       service?

11             MR. GEIGER:   Objection, hypothetical.

12             THE WITNESS:   I don't know.

13             MR. CHANDLER:   Q.   How would you find out?

14       A.    I would contact county counsel.

15       Q.    So based on whatever county counsel told you

16       would be the determination on whether or not it was a

17       religious service?

18       A.    Yes.

19             MR. GEIGER:   I want to clarify for the record

20       that we just advise staff.

21             MR. CHANDLER:   I don't think you can testify

22       for her.

23             MR. GEIGER:   I'm clarifying for the record

24       that we advise --

25             MR. CHANDLER:   Well, I don't think it's

1    appropriate for you to add your testimony to the record.

2        Q.   I'm sorry.  Just a minute.

3            Apart from a ban on religious services, are

4    there any other prohibitions on what groups may talk

5    about during meetings in a meeting room?

6        A.   No.

7        Q.   Are there any restrictions on the type of

8    organizations or groups that can use a meeting room?

9            MR. GEIGER:  The document speaks for itself.

10           THE WITNESS:  It says what types of groups can

11   use it:  Nonprofit and civic organizations, for-profit

12   organizations, school and governmental organizations.

13           MR. CHANDLER:  Q.  So are you aware of any

14   group that has been denied access to a meeting room

15   because the type of group that they were fell outside of

16   the policy?

17       A.   I'm sure there have been.  I can't give you an

18   example, but I'm sure that there have been.

19       Q.   What, what type of group would be prohibited

20   under this policy?

21           MR. GEIGER:  Objection.

22           MR. CHANDLER:  Q.  Can you think of an

23   example?

24           MR. GEIGER:  Objection, vague.

25           THE WITNESS:  No, I can't think of an example.

Merrill Legal Solutions
(800) 869-9132

1          MR. CHANDLER:  Q.  Are all nonprofit

2    organizations allowed, whether for a fee or not, whether

3    or not they can use a meeting room?

4          A.    If they're providing -- if it's a no-fee

5    usage, they'd have to have a meeting, program, or

6    activity of educational, cultural, or community

7    interest.

8          Q.    And if it's not under that category, they pay

9    a fee; is that right?

10          A.    Yes.

11          Q.    So any nonprofit can use it; the question is

12    whether or not they're paying a fee.  Is that accurate?

13          A.    I'm sorry.  Can you say that again?

14          Q.    The meeting rooms are open to any nonprofit

15    group.  The only issue is whether or not they determine

16    a fee; is that accurate?

17          A.    I think so.

18          Q.    And may any for-profit organization use the

19    meeting room?

20          MR. GEIGER:  The document speaks for itself.

21          THE WITNESS:  I think so.

22          MR. CHANDLER:  Q.  So is there anything in the

23    meeting room policy that would prohibit NAMBLA, for

24    example, from using a meeting room?

25          A.    No.

1        Q.    Is there anything in the meeting room policy

2   to prevent the KKK from using a meeting room?

3        A.    No.

4              MR. CHANDLER:  Why don't we go ahead and take

5   a few-minute break.

6              MR. GEIGER:  Okay.

7              (Recess taken.)

8              MR. CHANDLER:  Back on the record.

9        Q.    Miss Cain, we were discussing the religious

10  use aspect of Exhibit 4.  Have you, since the, since the

11  meeting room use policy was amended to limit only

12  religious services, have you had -- have you reviewed

13  applications where there was a question as to whether or

14  not a use was a religious service?

15       A.    No.

16       Q.    And --

17       A.    I'm sorry.  Can I --

18       Q.    Yes.

19       A.    -- change that?

20       Q.    Yes.

21       A.    Other than, other than the Faith Ministries.

22       Q.    Faith Center?

23       A.    Yeah, the Faith Center.  The answer is no,

24  other than that, that request from them.

25       Q.    And what did you advise Faith Center regarding

1   the religious services?

2        A.    I believe that we --

3             MR. GEIGER:  I think -- kind of a lack of

4   foundation there.  I mean . . . We don't -- go ahead.

5             MR. CHANDLER:  Q.  Did -- let me rephrase it.

6             Did you provide any indication to a Faith

7   Center representative about what the religious use

8   aspect of the meeting room policy prohibited?

9             MR. GEIGER:  Which . . .

10            MR. CHANDLER:  Q.  The current, in Exhibit 4,

11  the current meeting room use policy, did you communicate

12  to anyone from Faith Center about what that provision

13  means, the provision related to religious services?

14       A.    I believe we -- I communicated to them that

15  they may use the room but they may not use it for

16  religious services.

17       Q.    And did you provide any definition of

18  religious services?

19       A.    No.

20       Q.    Are you -- do you know of a definition of

21  religious services?

22            MR. GEIGER:  Objection, vague.

23            THE WITNESS:  No.

24            MR. CHANDLER:  Q.  So you don't know what

25  this, the religious use provisions, provision in the

                                                      40

1    Exhibit 4 actually prohibits.

2            MR. GEIGER:  Objection, asked and answered.

3            THE WITNESS:  It prohibits religious services.

4            MR. CHANDLER:  Q.  But you don't know what a

5    religious service is; is that correct?

6        A.   If they say they're using it for religious

7    service, I would say that they cannot use it.

8        Q.   So is it just if they use the term "religious

9    service" on an application, is that, is that how the

10   policy, is that how you intend the policy to be

11   enforced?

12           MR. GEIGER:  Objection.  Her intentions aren't

13   relevant.

14           THE WITNESS:  Yes.

15           MR. CHANDLER:  Q.  So if you had -- if there

16   are two applications for identical events and one of the

17   events is labeled a religious service and the other one

18   is not, only one of them would be allowed in the meeting

19   room; is that correct?

20           MR. GEIGER:  Objection, hypothetical.

21           THE WITNESS:  How --

22           MR. GEIGER:  Vague.

23           Go ahead.

24           THE WITNESS:  How would the other one be

25   described?

1      MR. CHANDLER:  Q.  Let's say one -- let's say

2    you had a policy, or an application, excuse me, an

3    application that said, We are going to do a presentation

4    on what the Bible says about managing your money.  And a

5    second application said, We are going to conduct a

6    religious service about what the Bible says about

7    managing money.  Would the first application be, fall --

8    would it be allowed under Exhibit 4?

9      MR. GEIGER:  Objection; hypothetical, calls

10   for speculation.

11     THE WITNESS:  I don't know.  I would get some

12   advice from county counsel and then make a decision.

13     MR. CHANDLER:  Q.  Are, to your knowledge, are

14   Bible studies permitted in the meeting room?

15     A.   I don't know.

16     Q.   How would you make that determination?

17     MR. GEIGER:  Objection, vague.  What kind of

18   determination?

19     MR. CHANDLER:  Q.  How would you decide

20   whether or not a group could engage in a Bible study in

21   the meeting room?

22     A.   I would get some advice and talk it over with

23   county counsel, then make the decision.

24     Q.   So the county counsel is the one that makes

25   the final determination of policy for the --

1        A.    No.   I do.

2        Q.    So why -- if you, if you're the one making the

3   final determination, then aren't -- why wouldn't you be

4   the one to make the decision as far as whether or not a

5   Bible study would be permitted?

6        A.    Yes, I would make that decision, but I would

7   discuss it with our attorneys first.

8        Q.    Could a, could a financial organization use a

9   meeting room to do a presentation on what, how to manage

10   money?  Like some, you know, Merrill-Lynch or some group

11   like that, come in and do a presentation on how to

12   manage your money?

13        A.    That's open to the public?

14        Q.    Uh-huh.

15        A.    Yes.

16        Q.    And could a, could a religious group do a

17   similar presentation on how to manage money --

18        A.    Yes.

19        Q.    -- based on Bible teachings?

20        A.    Yes.

21        Q.    Okay.   So it is okay to teach about what the

22   Bible says about how to manage your money.

23·       A.    I would think so.

24        Q.    So if a, if an application was submitted that

25   said, We are going to do a religious service that

43

1    discusses or that teaches how to manage your money based
2    on the Bible, would that be permitted?
3              MR. GEIGER:  Objection, calls for speculation.
4              THE WITNESS:  If it had the term "religious
5    service" in it I would probably get some advice.  I
6    mean, I don't understand what a religious service that
7    teaches about the use of money means.
8              MR. CHANDLER:  Q.  So it doesn't necessarily,
9    this doesn't necessarily prohibit all religious
10   services.
11             MR. GEIGER:  Objection; irrelevant, speaks --
12   the document speaks for itself.
13             THE WITNESS:  This prohibits religious
14   services.
15             MR. CHANDLER:  Q.  If it prohibits religious
16   service and somebody said they were engaging in a
17   religious service that teaches about how to manage your
18   money, why would there be a need to discuss it with
19   county counsel or anybody else?
20             MR. GEIGER:  Objection, calls for speculation.
21             THE WITNESS:  Because --
22             MR. GEIGER:  I think you've asked that
23   question a few times.
24             THE WITNESS:  Because it mentions religious
25   services.

1            MR. CHANDLER:  Q.  So it mentions religious

2    services, but that doesn't automatically mean it's a

3    religious service, you still have to discuss it with

4    county counsel.

5            MR. GEIGER:  The document speaks for itself.

6            THE WITNESS:  If somebody submitted a form

7    asking for something that includes a religious service,

8    I would get some advice before making a decision.

9            MR. CHANDLER:  Q.  Okay.  Do you review

10   meeting room use applications to determine if they

11   satisfy the meeting room use policy as part of your job,

12   just generally?

13       A.    All of them?

14       Q.    All of the what?

15       A.    All of the meeting room requests?

16       Q.    No, any requests.  Do you ever receive

17   requests to determine whether or not they meet the

18   meeting room use policy?

19       A.    Yeah, I described earlier what the process

20   would be if somebody had a question.  They would ask

21   first their supervisor, the community library manager,

22   and if they still had a question, they would consult

23   with the deputy county librarian, and if they had a

24   question, they would ask me.

25       Q.    So has that actually occurred, where a deputy

1  county librarian has come to you and said they're not

2  sure if a particular use falls within the meeting room

3  use policy?

4       A.   Yes.

5       Q.   And how often has that happened?

6            MR. GEIGER:  Objection, vague.

7            THE WITNESS:  I can't remember the last time,

8  so not very often.

9            MR. CHANDLER:  Q.  Can you remember any

10  specific examples of when that happened?

11      A.   Well, Faith Ministry use.  I can't remember

12  specifics of any others, but I know that there have been

13  some.

14      Q.   Are you aware of any times that a meeting

15  room, or where you have been involved in a decision to

16  deny access to a meeting room to an applicant?

17      A.   I can't remember any specific examples.

18      Q.   Do you have -- we discussed this a little bit

19  in the context of the school use, but I'd like to

20  broaden it a little bit.  Do you have the authority to

21  grant exceptions to the meeting room use policy?

22      A.   Do I have authority . . .  No.

23      Q.   So do you recall one of the library employees

24  having a wedding reception or asking to have a wedding

25  reception in the library?

46

1          A.    I remember -- I don't think it was a wedding

2    reception.  I think somebody told me it was a wedding

3    reception, but it turned out it wasn't the same day; it

4    was something in preparation for a wedding.  It was

5    something to do with the staff member's wedding.

6          Q.    And you don't remember anything further about

7    the meeting or the event?

8          A.    We told them they couldn't use it.

9          Q.    Oh, you did, okay.

10         A.    Yes.

11         Q.    And the El Sobrante library -- well, let me

12   back up.

13               Do you recall why you said they couldn't use

14   the meeting room?

15         A.    Because we wouldn't allow a member of the

16   public to use it for that reason.

17         Q.    And what was the reason?

18         A.    It was for something having to do with a

19   wedding.  I think maybe it was -- give me just a minute.

20   I'll think of it.

21         Q.    That's fine.  Take your time.

22         A.    I don't remember it being the El Sobrante

23   library.

24         Q.    It wasn't.  I'm sorry; I was moving on, and --

25         A.    I thought it was the Ygnacio Valley library,

47

1    and it -- I remember now who it was.  I think it was the

2    Ygnacio Valley library, and I believe the question was

3    asked of me whether they could use it for a reception.

4    But I knew it wasn't the reception, because I had been

5    invited to the wedding and it was a different date.  So

6    I think it was something having to do with a wedding

7    prior to the wedding.  Maybe -- I don't, I don't

8    actually know that I found out what it was, but we told

9    them no, that they could not use it for that purpose.

10       Q.   And do you -- can you identify what aspect of

11   the meeting room use policy it violated?

12       A.   It wasn't an organization asking to use a

13   meeting room for educational, cultural, or community

14   interest.  It was not a nonprofit or civic organization.

15   It was not a for-profit organization or a school or a

16   government organization.  It was an individual staff

17   member.

18       Q.   Are all organizations required to have -- I'm

19   sorry.  Are all events required to be of educational,

20   cultural, or community interest?

21       A.   In our use, yes.  In fact, I believe that I

22   told whoever it was that asked me that they could go use

23   one of the meeting rooms that's under a city policy and

24   pay to use it.

25       Q.   Could they -- could you have paid to use one

1   of the library meeting rooms?

2        A.   No.

3        Q.   Does the educational, cultural, or community

4   interest requirement apply to fee-based usage?

5        A.   "Nonprofit or civic organizations, for-profit

6   organizations, schools or government organizations may

7   use the meeting room for a fee."  This was a staff

8   member.  It doesn't fit that.

9        Q.   I understand.  I'm asking about the

10  educational, cultural, or community interest aspect.

11  And I may have misunderstood you, but I thought you had

12  said that the, the wedding event, whatever it was, was

13  not an educational, cultural, or community interest.

14  And I'm asking if that requirement is only for no-fee

15  usage, or if that applies to the fee-based usage as

16  well?

17            MR. GEIGER:   Objection, the document speaks

18  for itself.

19            THE WITNESS:   No, I don't think it does.  It's

20  not open to the public.

21            MR. CHANDLER:   Q.   So --

22       A.   But this particular request didn't fit.  It

23  wasn't an organization; it was an individual that was

24  asking.

25       Q.   Okay.  Did you, at the El Sobrante -- did I

1    say that right?

2         A.    Uh-huh.

3         Q.    Library, was there a memorial service held at

4    that library for a Philo Scott, P-H-I-L-O?

5         A.    There was a memorial service held there.

6         Q.    And did they use the meeting room?

7         A.    I don't know.

8         Q.    Would that type of event fall within the

9    meeting room use policy?

10        A.    I don't know that they used the meeting room.

11   I think maybe they had that outside maybe.  There's a

12   reading garden there.  But they used the, they used the

13   facility for that.

14        Q.    If they had -- or would they have been allowed

15   to use the meeting room for that?

16             MR. GEIGER:  Objection, calls for speculation.

17             THE WITNESS:  I don't know.

18             MR. CHANDLER:  Q.  Well, who would know?

19        A.    It didn't come in as a request to use the

20   meeting room.

21        Q.    Would it fall within Exhibit 4?

22             MR. GEIGER:  Objection, vague.  Would what

23   fall within?

24             MR. CHANDLER:  Q.  Would the, would a memorial

25   service be permitted under Exhibit 4?

1          A.    I don't know, I mean, if it was a nonprofit,

2     or it fits the other criteria there.

3          Q.    So if a nonprofit organization or a, or a

4     civic organization wanted to have a memorial service in

5     the library meeting room, that would be okay?

6          A.    If it was of community interest, probably.

7          Q.    Well, if it wasn't of community interest,

8     they'd just have to pay a fee; is that right?

9          A.    If it was closed to the general public?

10         Q.    Would they have to pay a fee then?

11         A.    I don't know.  You know, you're asking me

12    about something that, you know, when I -- if I were to

13    get a request, I would think about it and take a look at

14    it, and you're asking about something that didn't

15    happen.

16         Q.    But the reason I'm asking these questions is

17    because you are the head librarian for the county.

18    You're the one that recommended this policy, and I'm

19    just trying to understand your understanding of the

20    policy, since it's something that you recommended.

21    So --

22         A.    Well, my understanding --

23               MR. GEIGER:   There's no question on the table.

24               THE WITNESS:   Okay.

25               MR. CHANDLER:   Q.   So what -- is it your

1   understanding, having recommended this policy, that a

2   memorial service would be permitted under Exhibit 4?

3          MR. GEIGER:  Well, I'm going to object again.

4   The document speaks for itself, and you're calling for

5   speculation.

6          THE WITNESS:  If it meets the criteria here,

7   then yes.

8          MR. CHANDLER:  Q.  Would you . . . Okay.

9          Let's change or shift gears a little bit.

10  The -- prior to the Faith Center lawsuit being filed,

11  did you have any communications with any representatives

12  from Faith Center?

13     A.    Not that I recall.

14     Q.    Do you recall discussing Faith Center's event

15  with any library employees before, before the lawsuit

16  was filed?

17         MR. GEIGER:  Objection, vague.  Which event?

18         MR. CHANDLER:  Q.  Do you recall the Faith

19  Center having a meeting at the Antioch library that

20  triggered the lawsuit?  The initial, their initial

21  meeting in 2004, do you recall that that occurred?

22     A.    Yes.

23     Q.    And did you discuss that meeting with any

24  library employees prior to the lawsuit being filed?

25     A.    I'm sure I probably did.

1      Q.    Do you recall who?

2      A.    I don't specifically recall who, but it

3   probably would have been either our, one of the deputies

4   or possibly our administrative services officer at the

5   time.  I, I think that they probably asked for my

6   advice, or asked me what to do about it.

7      Q.    Who is the deputy that oversees the Antioch

8   branch?

9      A.    Right now it's Laura O'Donoghue.  I, I don't

10  think she did in 2004.  Let me think here.  I don't

11  recall whether or not she did in 2004.

12     Q.    Would you have been the one who made the final

13  determination to deny Faith Center's applications under

14  the meeting room use policy?

15     A.    Yes.

16           MR. CHANDLER:  And . . .

17           (Deposition Exhibit 9 was marked for

18           identification.)

19           MR. CHANDLER:  Q.  The court reporter has

20  handed you what's been marked as Exhibit 9.  Do you

21  recognize this document?

22     A.    Yes.

23     Q.    Is that your signature at the bottom?

24     A.    Yes.

25     Q.    So did you send this letter to Pastor Hattie

1    Hopkins?

2        A.    Yes.

3        Q.    Other than this letter, have you had any other

4    communications with Pastor Hopkins?

5        A.    Not that I recall.

6        Q.    Have you had any communications with anybody

7    else from Faith Center other than this letter?

8        A.    Not that I recall.

9        Q.    Have you ever contacted other libraries to

10   inquire whether their meeting room policies prohibit

11   religious services or any other religious use?

12       A.    Yes.

13       Q.    Approximately how many?

14       A.    I believe I sent something out on one of our

15   LIS serves.  I don't recall which one.  Possibly Urban

16   Library Council Directors or the BALIS, which are the

17   Bay Area libraries.  I don't recall.

18       Q.    Do you recall approximately how many responses

19   you got?

20       A.    No.

21       Q.    Was it more than five?

22       A.    I don't recall.

23       Q.    Do you recall receiving any responses from

24   other libraries that prohibited religious meetings?

25       A.    Religious meetings?

1    Q.   Or any sort of religious activity.

2    A.   I don't recall.

3    Q.   Did you or anyone on your staff research other

4    library meeting room policies and whether they

5    prohibited any religious activities?

6    A.   I can't address what other people did.

7    Q.   Have you seen any research, if you haven't

8    done it yourself?

9    A.   Well, what I did was to send something out on

10   one or more of the LIS serves.  I believe that's all

11   that I did.

12   Q.   And to clarify, you don't recall -- or were

13   there any that -- are you aware of any other library

14   meeting room use policies that prohibit religious

15   services or some sort of religious activity?

16   A.   Sorry.  Did you say, Do you recall any, any

17   that responded or . . .?

18   Q.   I'm sorry.  Are you aware of any, are you

19   aware of any other library meeting room use policies

20   that prohibit some sort of religious activity?

21   A.   I don't know.

22        MR. CHANDLER:  I think we just need a couple

23   of minutes, make sure I've covered everything, if that's

24   okay.

25        MR. GEIGER:  Okay.

1          (Recess taken.)

2          MR. CHANDLER:  Let's go back on the record.

3     Q.   I just want to go back to the Exhibit 4 and

4   the religious services, religious use aspect one more

5   time.  I'll give you a chance to grab your glasses if

6   you need them.

7          Now, I understand what you said earlier about

8   getting advice from county counsel, but I'm wondering,

9   in your mind, as the person who recommended the policy,

10  what does the prohibition on religious services mean?

11         MR. GEIGER:  Objection, it speaks for itself.

12         THE WITNESS:  It means religious services

13  can't be held in the library meeting room.

14         MR. CHANDLER:  Q.  But as the, as the person

15  who's in charge of administering county policy, do you

16  know what religious services means?

17    A.   I think it would be whatever the group

18  describe it as, whether it's a religious service.

19    Q.   So you rely entirely on what the applicant

20  says?

21    A.   I'm not sure I could say rely entirely, but

22  again, if it was something that I had a question about,

23  I would seek some advice.

24    Q.   And I understand.  I guess I'm, I'm wondering

25  your personal understanding of the term "religious

1    services."

2              MR. GEIGER:  Objection.  That's irrelevant.

3              MR. CHANDLER:  Q.  What that means.

4              MR. GEIGER:  Irrelevant.

5              MR. CHANDLER:  Q.  You can answer the

6    question.

7         A.   Well, I would make sure that -- I would try to

8    make sure that the group understand, understood that we

9    don't allow religious services.

10        Q.   And when you -- if you inform a group that you

11   don't allow religious services, in your mind, what does

12   that mean that you don't allow?

13        A.   Religious services.

14        Q.   And what does that term mean?  I understand

15   that, and I feel like I'm asking the same question --

16             MR. GEIGER:  Well, and you are, so I'm going

17   to object.

18             MR. CHANDLER:  Q.  I just -- but I just want

19   to get a definition of "religious services."

20             MR. GEIGER:  She's answered the same question.

21             THE WITNESS:  I would make sure that the group

22   understood what the policy is, and --

23             MR. CHANDLER:  Q.  I understand, but you

24   you're not answering my question.

25             MR. GEIGER:  She is --

                                                          57

1      MR. CHANDLER:  Q.  And if you don't know --

2      MR. GEIGER:  -- answering the question.

3      MR. CHANDLER:  Q.  -- what the definition is,

4  that's okay.  I'm just -- you informed a group that they

5  are not allowed to engage in a religious service.  I'm

6  wondering what your understanding of "religious service"

7  is.

8      MR. GEIGER:  Objection, relevance.  The

9  document speaks for itself.

10      THE WITNESS:  I've already answered that,

11  haven't I?

12      MR. CHANDLER:  Q.  The meeting room use policy

13  prohibits religious services, but it doesn't define the

14  term "religious service" anywhere, does it?

15      A.  That's correct.

16      Q.  So how would you, as the person who

17  administers this policy, define that term, "religious

18  services"?

19      A.  I don't know that --

20      MR. GEIGER:  Objection, relevance.  The

21  document speaks for itself.  You've asked the same

22  question several times.

23      MR. CHANDLER:  Q.  You can answer.

24      A.  I've already answered it.  I'm just going to

25  give you the same answer I've given before.

58

1          Q.    I don't think you've given me a definition of
2     the term.
3          A.    I don't think that I have to define it.
4          Q.    I'm asking you to do that.  It's --
5                MR. GEIGER:  You can't force her to answer
6     something.  I think she's answered it.
7                MR. CHANDLER:  Q.  Do you know what the
8     definition is?
9                MR. GEIGER:  Objection, vague.
10               MR. CHANDLER:  Q.  The definition of
11    "religious services," do you know what it is?
12         A.    I don't know that I have to know what it is.
13    I, again, I would rely on the group to understand that
14    they cannot have a religious service there.
15         Q.    So if a group says, or if a group determines
16    that something is a religious service, that's what you
17    prohibit, you rely on the applicant.
18         A.    If somebody said they were having a religious
19    service there, we would not allow it.
20               MR. CHANDLER:  Okay.  All right.  I think
21    that's all I have.
22               MR. GEIGER:  I don't have anything.
23               MR. CHANDLER:  Then I guess you're free to go.
24               (Whereupon, the deposition was
25               adjourned at 10:40 a.m.)

1                          --oOo--

2          I declare under penalty of perjury that the

3     foregoing is true and correct.  Subscribed at

4     _____, California, this _____ day of

5     _____, 2008.

6

7

8                                 _____

9                                 ANNE CAIN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2          I, CAROLYN M. MANN, a Certified Shorthand

 3     Reporter, hereby certify that the witness in the

 4     foregoing deposition was by me duly sworn to tell the

 5     truth, the whole truth, and nothing but the truth in the

 6     within-entitled cause;

 7          That said deposition was taken down in

 8     shorthand by me, a disinterested person, at the time and

 9     place therein stated, and that the testimony of the said

10     witness was thereafter reduced to typewriting, by

11     computer, under my direction and supervision;

12          That before completion of the deposition,

13     review of the transcript [X] was [ ] was not requested.

14     If requested, any changes made by the deponent (and

15     provided to the reporter) during the period allowed are

16     appended hereto.

17          I further certify that I am not of counsel or

18     attorney for either or any of the parties to the said

19     deposition, nor in any way interested in the event of

20     this cause, and that I am not related to any of the

21     parties thereto.

22          DATED:      7/28/08

23

24

25          CAROLYN M. MANN, CSR No. 10066
```

OPERATIONS

THE BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY, CALIFORNIA

, Adopted this Order on _____ November 17, 1992 _____, by the following vote:

AYES:      Supervisors Powers, Fahden, Schroder, Torlakson, McPeak
NOES:      None
ABSENT:    None
ABSTAIN:   None

|-10/

RESOLUTION NO. 92/ 793

SUBJECT:   IN THE MATTER OF ADOPTING A POLICY FOR THE USE OF MEETING
ROOMS IN LIBRARIES

Upon recommendation of the County Librarian, this Board adopts the
following policy and rescinds all previously adopted policies and rules and regulations
(including Resolution No 78/322 in its entirety) for the use of meeting rooms in libraries:

Contra Costa County Library
POLICY FOR USE OF MEETING ROOMS IN LIBRARIES

It is the policy of the Contra Costa County Library to encourage the use of library meeting
rooms for educational, cultural and community related meetings, programs, and activities.

NO-FEE USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental
organizations offering meetings, programs, or activities of educational, cultural or
community interest may use the meeting room free of charge for meetings that are open
to the general public, for which no admission fee is charged, _and_ at which no soliciting
or selling is done.

FEE-BASED USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental
organizations may use the meeting room for a fee for meetings that are closed to the
general public, for which an admission fee is charged, _or_ at which soliciting or selling
takes place.

EDUCATIONAL USE
Library meeting rooms are available to schools only for special meetings, programs, or
activities   They may not be used for instructional purposes as a regular part of the
curriculum.

RELIGIOUS USE
Library meeting rooms shall not be used for religious purposes.

APPLICATION FOR USE
All groups requesting use of a library meeting room must fully complete an application
form for each use.

RULES FOR USE
The County Librarian shall promulgate Rules for the implementation of this Policy. Such
Rules may contain branch specific rules. The County Librarian may deny application or
revoke permission previously granted when such application or permission is for a use
not permitted by this Policy, when the applicant has violated the Rules promulgated by
the County Librarian, or when the meeting room is needed for library purposes.

cc:      County Library
County Administrator
County Auditor

I hereby certify that this is a true and correct ...
on action ... and entered on the minutes of ...
Board of Supervisors on the date shown.
ATTESTED _____ March 17, 1992 _____
PHIL BATCHELOR, Clerk of the Board
of Supervisors and County Administrator

by _____ C. Matthews _____, Deputy

RESOLUTION NO. 92/ 793

EXHIBIT
Cain
1
7-15-08

_Contra Costa County Library Policy and Procedure Manual_

2-3.2

OPERATIONS

THE BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY, CALIFORNIA

Adopted this Order on ___August 17, 1993___, by the following vote:

AYES:     Supervisors Powers, Smith, Bishop, McPeak and Torlakson
NOES:     None
ABSENT:   None
ABSTAIN:  None

RESOLUTION NO. 93/ 525

SUBJECT:  IN THE MATTER OF ADOPTING A POLICY FOR THE USE OF MEETING
          ROOMS IN LIBRARIES

Upon recommendation of the County Librarian, this Board adopts the following policy and rescinds all previously adopted policies and rules and regulations (including Resolution No. 92/793 in its entirety) for the use of meeting rooms in libraries:

### Contra Costa County Library
### POLICY FOR USE OF MEETING ROOMS IN LIBRARIES

It is the policy of the Contra Costa County Library to encourage the use of library meeting rooms for educational, cultural and community related meetings, programs, and activities.

#### NO-FEE USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations offering meetings, programs, or activities of educational, cultural or community interest may use the meeting room free of charge for meetings that are open to the general public, for which no admission fee is charged, and at which no soliciting or selling is done.

#### FEE-BASED USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations may use the meeting room for a fee for meetings that are closed to the general public, for which an admission fee is charged, or at which soliciting or selling takes place.

#### EDUCATIONAL USE
Library meeting rooms are available to schools only for special meetings, programs, or activities. They may not be used for instructional purposes as a regular part of the curriculum.

#### RELIGIOUS USE
Library meeting rooms shall not be used for religious services or activities.

#### APPLICATION FOR USE
All groups requesting use of a library meeting room must fully complete an application form for each use.

#### RULES FOR USE
The County Librarian shall promulgate Rules for the implementation of this Policy. Such Rules may contain branch specific rules. The County Librarian may deny application or revoke permission previously granted when such application or permission is for a use not permitted by this Policy, when the applicant has violated the Rules promulgated by the County Librarian, or when the meeting room is needed for library purposes.

cc:       County Library
          County Administrator
          County Counsel

I hereby certify that this is a true and correct copy of an action taken and entered on the minutes of the Board of Supervisors on the date shown.

ATTESTED: _August 17, 1993_
          PHIL BATCHELOR, Clerk of the Board
          of Supervisors and County Administrator

RESOLUTION NO. 93/ 525  By _____, Deputy

EXHIBIT
Cain
2
7-15-08

*Contra Costa County Library Policy and Procedure Manual*
2-3.1

| TO: | BOARD OF SUPERVISORS |
| FROM: | Anne Cain, County Librarian |
| DATE: | December 14, 2004 |
| SUBJECT: | Revise Library Policy: Use of Meeting Rooms |

**Contra Costa County**

*C123*

SPECIFIC REQUEST(S) OR RECOMMENDATION(S) & BACKGROUND AND JUSTIFICATION

## RECOMMENDATION

The County Librarian recommends that the Board of Supervisors adopt revision to the Library Meeting Room Policy: Use of Meeting Rooms (Resolution No.93-525) to exclude the words "or activities" from the section entitled Religious Use.

## FINANCIAL IMPACT

None.

## BACKGROUND

Recently, two Library policies were reviewed for compliance with current law. Presently, in the section for Religious Use, the language in the Library Meeting Room Policy reads: "Library meeting rooms shall not be used for religious services or activities". It is recommended that the policies be changed to eliminate the reference to the prohibition of "religious activities". The proposed new language would read: "Library meeting rooms shall not be used for religious services."

Upon approval by the Board of Supervisors, these policies will be revised to reflect the new language.

CONTINUED ON ATTACHMENT: ☑ YES          SIGNATURE: *Anne Cain*

☑ RECOMMENDATION OF COUNTY ADMINISTRATOR          ☐ RECOMMENDATION OF BOARD COMMITTEE
☑ APPROVE          ☐ OTHER

SIGNATURE(S):

ACTION OF BOARD ON *December 14, 2004*          APPROVED AS RECOMMENDED ☒     OTHER ☐

VOTE OF SUPERVISORS:

☒ UNANIMOUS (ABSENT _____ )
AYES: _____ NOES: _____
ABSENT: _____ ABSTAIN: _____

Contact:

cc:     Susan Caldwell, County Library
        Julie Enea, County Administrator
        Silvano Marchesi, County Counsel

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY OF AN ACTION TAKEN AND ENTERED ON THE MINUTES OF THE BOARD OF SUPERVISORS ON THE DATE SHOWN.

ATTESTED _____
JOHN SWEETEN, CLERK OF THE BOARD OF SUPERVISORS AND COUNTY ADMINISTRATOR.

By _____ , Deputy

O:\boa\TEMPLATE\reGULAR\meeting room policy revise board order.doc

**EXHIBIT**
*Cain*
**3**
*7-15-08*

274

# THE BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY, CALIFORNIA

Adopted this Resolution on     December 14, 2004                    , by the following vote:

AYES:     SUPERVISORS GIOIA, UILKEMA, GREENBERG, DESAULNIER
NOES:     NONE
ABSENT.     SUPERVISOR GLOVER
ABSTAIN: none

RESOLUTION NO.     2004/655

SUBJECT:  IN THE MATTER OF ADOPTING A POLICY FOR THE USE OF MEETING
ROOMS IN LIBRARIES

Upon recommendation of the County Librarian, this Board adopts the following policy and rescinds all
previously adopted policies and rules and regulations (including Resolution No. 93/525 in its entirety)
for the use of meeting rooms in libraries:

## Contra Costa County Library
## POLICY FOR THE USE OF MEETING ROOMS IN LIBRARIES

It is the policy of the Contra Costa County Library to encourage the use of library meeting rooms for
educational, cultural and community related meetings, programs, and activities.

### NO-FEE USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations
offering meetings, programs, or activities of educational, cultural or community interest may use the
meeting room free of charge for meetings that are open to the general public, for which no admission
fee is charged, and at which no soliciting or selling is done.

### FEE-BASED USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations
may use the meeting room for a fee for meetings that are closed to the general public, for which an
admission fee is charged, or at which soliciting or selling takes place.

### EDUCATIONAL USE
Library meeting rooms are available to schools only for special meetings, programs, or activities. They
may not be used for instructional purposes as a regular part of the curriculum.

### RELIGIOUS USE
Library meeting rooms shall not be used for religious services.

### APPLICATIONS FOR USE
All groups request use of a library meeting room must fully complete an application form for each use.

### RULES FOR USE
The County Librarian shall promulgate rules for the implementation of this policy. Such rules may
contain branch specific rules. The County Librarian may deny any application or revoke any permission
previously granted when such application or permission is for a use not permitted by this policy, when
the applicant has violated the rules promulgated by the County Librarian, or when the meeting room is
needed for library purposes.

cc:     County Librarian
County Administrator
County Counsel

I hereby certify that this is a true and correct
copy of an action taken and entered on the
minutes of the Board of Supervisors on the
date shown.

ATTESTED: _____
JOHN SWEETEN, Clerk of the Board
of Supervisors and County Administrator

By _____ Deputy

## THE BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY, CALIFORNIA

Adopted this Resolution on __December 14, 2004_____, by the following vote:

C.123

| | |
|---|---|
| AYES: | SUPERVISORS GIOIA, UILKEMA, GREENBERG, DESAULNIER |
| NOES: | NONE |
| ABSENT: | SUPERVISOR GLOVER |
| ABSTAIN: | none |

RESOLUTION NO.    2004/655

SUBJECT: IN THE MATTER OF ADOPTING A POLICY FOR THE USE OF MEETING ROOMS IN LIBRARIES

Upon recommendation of the County Librarian, this Board adopts the following policy and rescinds all previously adopted policies and rules and regulations (including Resolution No. 93/525 in its entirety) for the use of meeting rooms in libraries:

### Contra Costa County Library
### POLICY FOR THE USE OF MEETING ROOMS IN LIBRARIES

It is the policy of the Contra Costa County Library to encourage the use of library meeting rooms for educational, cultural and community related meetings, programs, and activities.

#### NO-FEE USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations offering meetings, programs, or activities of educational, cultural or community interest may use the meeting room free of charge for meetings that are open to the general public, for which no admission fee is charged, and at which no soliciting or selling is done.

#### FEE-BASED USAGE
Non-profit and civic organizations, for-profit organizations, schools and governmental organizations may use the meeting room for a fee for meetings that are closed to the general public, for which an admission fee is charged, or at which soliciting or selling takes place.

#### EDUCATIONAL USE
Library meeting rooms are available to schools only for special meetings, programs, or activities. They may not be used for instructional purposes as a regular part of the curriculum.

#### RELIGIOUS USE
Library meeting rooms shall not be used for religious services.

#### APPLICATIONS FOR USE
All groups request use of a library meeting room must fully complete an application form for each use.

#### RULES FOR USE
The County Librarian shall promulgate rules for the implementation of this policy. Such rules may contain branch specific rules. The County Librarian may deny any application or revoke any permission previously granted when such application or permission is for a use not permitted by this policy, when the applicant has violated the rules promulgated by the County Librarian, or when the meeting room is needed for library purposes.

cc:    County Librarian
       County Administrator
       County Counsel

I hereby certify that this is a true and correct copy of an action taken and entered on the minutes of the Board of Supervisors on the date shown.

ATTESTED: _____
   JOHN SWEETEN, Clerk of the Board
   of Supervisors and County Administrator

By _____ Deputy

EXHIBIT
Cain
4
7-15-08

12/2004

*Contra Costa County Library Policy and Procedure Manual*

# Contra Costa County Library

## APPLICATION AND PERMIT FOR USE OF MEETING ROOM

Name of Library __Pinole Library__
Date of Meeting __February 19__
Time of Meeting: From __11__ To __4__ Total time __5 hr.__
Name of Applicant __Melissa S. Robinett__
Name of Organization __Pinole Valley High School A.P. Biology Class__
Purpose of Organization __To prepare for the A.P. Exam__
Purpose of Meeting __" " " " " " "__

I have read and agree to abide by and uphold all rules and policies of the Contra Costa County Library and the branch library governing the use of library premises or equipment, and I understand that failure to do so will result in loss of future privileges in the use of library meeting rooms. I understand that there is a no refund policy on the fee-based use of meeting rooms.

I agree that __Melissa S. Robinett__ shall defend, indemnify, save, and hold harmless Contra
(name of person)
Costa County and its officers and employees from any and all claims, costs, and liability for any damages, sickness, death, or injury to person(s) or property, including without limitation all consequential damages, from any cause whatsoever arising directly or indirectly from or connected with the operations or services of __Melissa S. Robinett__ or its agents, servants, employees, or subcontractors hereunder, save and except claims
(name of person)
or litigation arising through the sole negligence or sole willful misconduct of Contra Costa County or its officers or employees. __Melissa S. Robinett__ will reimburse Contra Costa County for any expenditures, including
(name of person)
reasonable attorneys' fees, Contra Costa County may make by reason of the matters that are the subject of this indemnification, and if requested by Contra Costa County, will defend any claims or litigation to which this indemnification provision applies at the sole cost and expense of __Melissa S. Robinett__ .
(name of person)

Signature __Melissa S. Robinett__ Date __12/20/07__
Position in organization __Teacher__
Home address __50 Scotts Valley Hercules, CA__ Phone __(510) 724-2089__
Business address __2900 Pinole Valley Rd__ Phone __(510) 758-4664__

---

## -- For Library Use Only --

Non Fee Use
Approved ☒
Not Approved ☐ Reason: _____

Fee Based Use
Approved ☐
Not Approved ☐ Reason: _____
Amount of Fee Received: _____ Received by: _____

Librarian in charge __Nori Ne Caun__ Date __12/20/07__

EXHIBIT
Cain
5
7-15-08

Form 3-12 (revised 8/92)

4547

CONTRA COSTA COUNTY LIBRARY
## APPLICATION AND PERMIT FOR USE OF MEETING ROOM

| | |
|---|---|
| Name of Library: | Antioch Public Library |
| Date of Meeting: | 2/18/08 |
| Time of Meeting: | From: 1 pm To: 5pm Total Time: 4 hours |
| Name of Applicant: | Veronica Hein |
| Name of Organization: | Antioch High School Mock Trial Team |
| Purpose of Organization: | Compete in CCC Mock Trial |
| Purpose of Meeting: | practice for Mock Trial |

I have read and agree to abide by and uphold all rules and policies of the Contra Costa County Library and the branch library governing the use of library premises or equipment, and I understand that failure to do so will result in loss of future privileges in the use of library meeting rooms. I understand that there is a no refund policy on the fee-based use of meeting rooms.

I agree that: (name of person) **Veronica Hein** shall defend, indemnify, save, and hold harmless Contra Costa County and its officers and employees from any and all claims, costs, and liability for any damages, sickness, death, or injury to person(s) or property, including without limitation all consequential damages, from any cause whatsoever arising directly or indirectly from or connected with the operations or services of (name of person) **Veronica Hein** or its agents, servants, employees, or subcontractors hereunder, save and except claims or litigation arising through the sole negligence or sole willful misconduct of Contra Costa County or its officers or employees.

(Name of Person) **Veronica Hein** will reimburse Contra Costa County for any expenditures, including reasonable attorneys' fees, Contra Costa County may make by reason of the matters that are the subject of this indemnification, and if requested by Contra Costa County, will defend any claims or litigation to which this indemnification provision applies at the sole cost and expense of (name of person) **Veronica Hein**

| | |
|---|---|
| Signature: | Veronica Hein |
| Date: | 2/16/08 |
| Position in Organization: | Teacher / Coach |
| Home Address: | 3586 Sharon Ct. Bay Point, CA 94565 |
| Home Telephone: | (925) 813-2734 |
| Business Address: | 700 W. 18th Street Antioch, CA 94509 |
| Business Telephone | (925) 756-5747 |

## — For Library Use Only —

| Non Fee Use | ☒ Approved | ☐ Not Approved |
|---|---|---|
| Reason: | | |
| Fee Based Use | ☐ Approved | ☐ Not Approved |
| Reason: | | |
| Amount of Fee Received: | Received by: | |
| Librarian in Charge: | [signature] | Date: 2/16/2008 |

EXHIBIT
Cam
6
7-15-08

Form 3-12 (Revised February 12, 2007)   http://stcllnet.ccclib.org/do/documentation/forms/application & permit to use meeting room (form 3-12, revised february 20...

2 1 5 6

# Contra Costa County Library

## APPLICATION AND PERMIT FOR USE OF MEETING ROOM

Name of Library _Antioch Library_
Date of Meeting _5.10.4_
Time of Meeting: From _4.3p_ To _7p_ Total time _2.5 hrs._
Name of Applicant _Nick Busbee_
Name of Organization _n/a_
Purpose of Organization _n/a_
Purpose of Meeting _Study Group_

I have read and agree to abide by and uphold all rules and policies of the Contra Costa County Library and the branch library governing the use of library premises or equipment, and I understand that failure to do so will result in loss of future privileges in the use of library meeting rooms. I understand that there is a no refund policy on the fee-based use of meeting rooms.

I agree that _Nick Busbee_ shall defend, indemnify, save, and hold harmless Contra
  _(name of person)_
Costa County and its officers and employees from any and all claims, costs, and liability for any damages, sickness, death, or injury to person(s) or property, including without limitation all consequential damages, from any cause whatsoever arising directly or indirectly from or connected with the operations or services of _Nick Busbee_ or its agents, servants, employees, or subcontractors hereunder, save and except claims
  _(name of person)_
or litigation arising through the sole negligence or sole willful misconduct of Contra Costa County or its officers or employees. _Nick Busbee_ will reimburse Contra Costa County for any expenditures, including
  _(name of person)_
reasonable attorneys' fees, Contra Costa County may make by reason of the matters that are the subject of this indemnification, and if requested by Contra Costa County, will defend any claims or litigation to which this indemnification provision applies at the sole cost and expense of _Nick Busbee_
  _(name of person)_
Signature _Nicholas D. E. Busbee_ Date _5.5.4_
Position in organization _____
Home address _____ Phone _(925).427.6818_
Business address _____ Phone _____

## -- For Library Use Only --

Non Fee Use
Approved [✓]
Not Approved [ ]   Reason: _____

Fee Based Use
Approved [ ]
Not Approved [ ]   Reason: _____
Amount of Fee Received: _____ Received by: _____

Librarian in charge _P. Cha_ Date _____

EXHIBIT
_Cam_
2
7-15-08

Form 3-12 (revised 8/92)

3075

# Contra Costa County Library

## APPLICATION AND PERMIT FOR USE OF MEETING ROOM

Name of Library ___ANTiocH   Library___

Date of Meeting ___03/28___

Time of Meeting: From ___10:00 am___ To ___12:30 pm___ Total time ___2.5 hrs___

Name of Applicant ___Patrick   Logan___

Name of Organization ___Student CMC___

Purpose of Organization ___Study___

Purpose of Meeting ___Study___

I have read and agree to abide by and uphold all rules and policies of the Contra Costa County Library and the branch library governing the use of library premises or equipment, and I understand that failure to do so will result in loss of future privileges in the use of library meeting rooms. I understand that there is a no refund policy on the fee-based use of meeting rooms.

I agree that ___Patrick   Logan___ shall defend, indemnify, save, and hold harmless Contra
               *(name of person)*
Costa County and its officers and employees from any and all claims, costs, and liability for any damages, sickness, death, or injury to person(s) or property, including without limitation all consequential damages, from any cause whatsoever arising directly or indirectly from or connected with the operations or services of ___Patrick  Logan___ or its agents, servants, employees, or subcontractors hereunder, save and except claims
      *(name of person)*
or litigation arising through the sole negligence or sole willful misconduct of Contra Costa County or its officers or employees. ___Patrick  Logan___ will reimburse Contra Costa County for any expenditures, including
          *(name of person)*
reasonable attorneys' fees, Contra Costa County may make by reason of the matters that are the subject of this indemnification, and if requested by Contra Costa County, will defend any claims or litigation to which this indemnification provision applies at the sole cost and expense of ___Patrick · Logan___ .
                                                        *(name of person)*

Signature ___(signature)___ Date ___03/28/05___

Position in organization ___student___

Home address ___11 Andrew Rd___ Phone ___707 336 1066___

Business address _____ Phone _____

## -- For Library Use Only --

Non Fee Use
Approved [X]
Not Approved [ ] Reason: _____

Fee Based Use
Approved [ ]
Not Approved [ ] Reason: _____
Amount of Fee Received: _____ Received by: _____

> **EXHIBIT**
> *Cain*
> 8
> ___7-15-08___

Librarian in charge ___Gail Middlekauff___ Date ___4·13-05___

Form 3-12 (revised 8/92)

2847

**County Library**

1750 Oak Park Boulevard
Pleasant Hill, California 94523-4497
(925) 646-6423
FAX (925) 646-6461



# Contra Costa County



**Anne Cain**
County Librarian

December 5, 2007

Pastor Hattie Hopkins, Founder / President
Mary Ward, Co-Applicant
Faith Center Evangelistic Ministry
(W.M.F.C. Fellowship)
P.O. Box 162076
Sacramento, CA 95816

Dear Pastor Hopkins,

This responds to your application to use the meeting room in the Antioch branch of the Contra Costa County Library on December 15, 2007. Your application specified the times 5:30 to 9:00. We presume you mean 5:30 p.m. to 9:00 p.m. You applied to use the meeting room for the following purpose: "Prayer, Praise, Wordshop, Purpose to Teach Scripture and Encourage Salvation thru Jesus to Build-Up this Community Overall." Your application to use the meeting room on December 15, 2007, from 5:30 p.m. to 9:00 p.m., is granted.

As you know, the meeting room is the subject of ongoing litigation. The Ninth Circuit Court of Appeals held in Faith Center Church Evangelistic Ministries, et al. v. Federal D. Glover, et al., 480 F.3d 891 (2007) that the County may prohibit religious worship services from the Antioch Branch Library meeting room, in accordance with the "Religious Use" provision of the County Library meeting room use policy. The "Religious Use" provision provides as follows: "Library meeting rooms shall not be used for religious services."

Your signed application to use the meeting room indicates that you have read and agree to abide by and uphold all rules and policies of the Contra Costa County Library governing the use of library premises. We will presume that you understand and will comply with the holding in Faith Center Church Evangelistic Ministries, et al. v. Federal D. Glover, et al., 480 F.3d 891 (2007). You may use the meeting room for any activity that does not violate the meeting room use policy, including activities that express a religious viewpoint. In accordance with the Ninth Circuit's holding, you are responsible for distinguishing religious worship services from other forms of religious speech. (480 F.3d at 918-919.)

Anne Cain

*Anne Cain*
County Librarian

EXHIBIT
Cain
9
7-15-08

cc:     Greta Galindo, Antioch Acting Senior Branch Librarian