**EXHIBIT C**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

FAITH CENTER CHURCH EVANGELISTIC

MINISTRIES, et al.,

ORIGINAL

        Plaintiffs,

   vs.              No. C 04-3111 JSW

FEDERAL D. GLOVER, et al.,

        Defendants.

_____/

DEPOSITION OF

LAURA O'DONOGHUE

_____

July 16, 2008

REPORTED BY: JANICE M. SMITHSON, CSR 5916

JOB NO. 411109

Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)

**M E R R I L L   L E G A L   S O L U T I O N S**

www.merrillcorp.com/law

135 Main Street, 4th Floor
San Francisco, CA 94105

(415) 357-4300 Tel

1                            I N D E X

2    EXAMINATION BY:                              PAGE

3        MR. CHANDLER                              5

4                         ---oOo---

5

6

7                       E X H I B I T S

8        (No exhibits marked in this transcript.)

9                         ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                           ---oOo---

4    FAITH CENTER CHURCH EVANGELISTIC

     MINISTRIES, et al.,

5

              Plaintiffs,

6

        vs.                          No. C 04-3111 JSW

7

     FEDERAL D. GLOVER, et al.,

8

              Defendants.

9    _____/

10                          ---oOo---

11           BE IT REMEMBERED that, pursuant to Notice,

12   and on Wednesday, July 16, 2008, commencing at 8:58 a.m.

13   thereof, at the OFFICE OF THE COUNTY COUNSEL,

14   Administration Building, 651 Pine Street, 9th Floor,

15   Martinez, California 94553, before me, JANICE M.

16   SMITHSON, a Certified Shorthand Reporter, personally

17   appeared

18                      LAURA O'DONOGHUE,

19   called as a witness by the Plaintiffs, who, having been

20   first duly sworn, was examined and testified as follows:

21

22

23

24

25

3

1                    A P P E A R A N C E S
2         FOR THE PLAINTIFFS:
3         LAW OFFICE OF ALLIANCE DEFENSE FUND
          101 Parkshore Drive, Suite 100
4         Folsom, California 95630
          By:  TIMOTHY D. CHANDLER, Attorney at Law
5              and DAVID MORRELL, Law Clerk
6
          FOR THE DEFENDANTS:
7
          LAW OFFICE OF CONTRA COSTA COUNTY
8         Office of the County Counsel
          651 Pine Street, 9th Floor
9         Martinez, California 94553
          By:  THOMAS L. GEIGER, Attorney at Law
10
                      ---oOo---
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1               PROCEEDINGS

2          MR. GEIGER:  Before we started, I wanted to put

3     something on the record from yesterday.  Patty Chan was

4     deposed yesterday, and she said that before her

5     deposition, she reviewed an email from 2004, and there

6     was some question as to whether that had been disclosed

7     in the request for production of documents to

8     Mr. Chandler, and it turns out it was disclosed.  It was

9     the emails with Bate stamps 1071 and 1072.

10          That's your understanding?

11          MR. CHANDLER:  Yes, that's correct.

12          MR. GEIGER:  Okay.  Okay, thanks.

13               EXAMINATION BY MR. CHANDLER

14          MR. CHANDLER:  Q.  Mrs. Donoghue, have you ever

15     had your deposition taken before?

16     A.    No.

17     Q.    As you're aware, you were just sworn in, which

18     means that everything you say is under oath, just like

19     you were giving testimony in court.

20          I'm going to ask you a series of questions, and

21     just answer them to the best of your knowledge.  If you

22     don't know, go ahead and say so.  I will try to keep my

23     questions clear, but if you don't understand something,

24     feel free to ask me to clarify.

25          Your attorney may object to some of my

5

1    questions, but unless he specifically advises you to not

2    answer the question, after he's done with his objection,

3    you can go ahead and answer the question.  And feel free

4    to ask me to restate the question or clarify, if needed.

5          Your answers should be clear and audible.

6    Everything is being taken down, so you should avoid

7    nodding or shaking your head or saying uh-huh or uh-uh;

8    and then we should do our best not to talk over each

9    other.  That's normal for every day conversation, but

10   because we need a transcript, it will be a lot easier for

11   everything to be recorded if we don't talk over each

12   other.

13         If at any point you want to take a break, just

14   let me know; that's not a problem.

15         Do you have any questions before we begin?

16   A.    No.

17   Q.    Could you state your name and spell it?

18   A.    Laura O'Donoghue, L-a-u-r-a O-D-o-n-o-g-h-u-e.

19   Q.    And besides your attorney, did you discuss this

20   deposition with anyone?

21   A.    No.

22   Q.    Did you review any documents in preparation for

23   this deposition?

24   A.    No.

25   Q.    Where are you currently employed?

6

1    A.    Contra Costa County Library.

2    Q.    How long have you been employed by the County?

3    A.    Seven and a half years.

4    Q.    What is your current position?

5    A.    Deputy County Librarian for Public Services.

6    Q.    What are your job duties?

7    A.    Primary responsibility is oversight of our

8  community libraries in our south county, east county, and

9  La Miranda areas.  And I also oversee certain programs.

10    Q.    Do you supervise the Antioch branch?

11    A.    Antioch Library is in our east county region.

12    Q.    So that is one that you supervise?

13    A.    Yes.

14    Q.    Do you work at the Antioch Library?

15    A.    No.

16    Q.    Where is your office?

17    A.    Pleasant Hill.

18    Q.    So if an Antioch librarian has a question about

19  how to enforce a library policy, would they direct that

20  question to you?

21    A.    They would direct it to their senior community

22  library manager.

23    Q.    And is that the librarian that manages the

24  Antioch branch?

25    A.    Yes.

7

1          Q.    If there's still a question at that point, would

2    the question come to you?

3          A.    Yes, at that point, it would come to me.

4          Q.    Who is your supervisor?

5          A.    Ann Kane.

6          Q.    Do you ever review applications to use a

7    library meeting room to determine if they satisfy the

8    County's meeting room use policy?

9          A.    Not on a daily basis, but yes, I do.

10         Q.    Can you recall any specific examples of requests

11   to use a library meeting room that was denied because it

12   did not comply with the meeting room use policy?

13              MR. GEIGER:  Objection, vague, relevance.

14              Go ahead.

15              THE WITNESS:  Yes.

16              MR. CHANDLER:  Q.  What was that situation?

17         A.    At the Antioch Library.

18         Q.    Who was the applicant?

19         A.    Faith Center Ministries.

20         Q.    Besides the Faith Center Ministries'

21   application, can you think of any other specific examples

22   of applications or requests to use the meeting room that

23   had been denied?

24         A.    No.

25         Q.    Do you have the authority to grant exceptions to

Merrill Legal Solutions
(800) 869-9132

1    the meeting room use policy?

2        A.    No.

3        Q.    I'd like to show her Exhibit 4, what was marked

4    as Exhibit 4 yesterday.

5            This document was marked as Exhibit 4 in the

6    previous deposition.  Take a minute to look it over and

7    tell me if you recognize this document.

8        A.    This is our meeting room use policy.

9        Q.    This is the current policy?

10       A.    Yes, it is.

11       Q.    Does this policy apply to the Antioch Library?

12       A.    Yes, it does.

13       Q.    I'd like to direct your attention to the

14   religious use aspect of the policy.  As the policy

15   currently stands, it prohibits all religious services.

16   Is that correct?

17       A.    Yes.

18           MR. GEIGER:  Objection, document speaks for

19   itself.

20           MR. CHANDLER:  Q.  To your knowledge, is the

21   term "religious service" defined in any County policy?

22           MR. GEIGER:  Objection, relevance.  The document

23   speaks for itself.

24           MR. CHANDLER:  Q.  Do you want me to repeat the

25   question?

1      A.   Yes, please.

2      Q.   To your knowledge, is the term "religious

3  service" defined in any County policy?

4      A.   No.

5      Q.   Has your supervisor ever given you any

6  instruction or guidance on what constitutes a religious

7  service?

8      A.   No.

9           MR. GEIGER:  Objection, relevance.

10          MR. CHANDLER:  Try to give him a chance --

11          THE WITNESS:  I'm sorry.

12          MR. CHANDLER:  -- to get his objection in.

13  That's fine.

14     Q.   Have you ever given the Antioch librarians any

15  guidance or instruction on what constitutes a religious

16  service under the meeting room use policy?

17     A.   No.

18     Q.   So how does a librarian determine whether a

19  group that's using a library meeting room decide if the

20  applicant is going to conduct a religious service?

21     A.   It's based on what the applicant tells us.

22     Q.   So does the librarian simply look for the term

23  "religious service" on the application, or is there a

24  different process of making that determination?

25     A.   Yes, we would look at what they tell us and make

10

1  the decision based on that.

2    Q.   So if a librarian receives an application that

3  says we're going to conduct a sermon, but they don't use

4  the term "religious service," would that be permissible?

5        MR. GEIGER:  Objection, calls for speculation,

6  hypothetical.

7        THE WITNESS:  At that point, it would be

8  referred to me, and I would probably refer it to my

9  supervisor.

10       MR. CHANDLER:  Q.  So the librarian isn't simply

11  looking for the term "religious services"?

12       MR. GEIGER:  Objection, vague.  Which librarian

13  are you talking about?

14       MR. CHANDLER:  Q.  If you're reviewing or a

15  librarian is reviewing a policy that does not use the

16  term "religious services," that the library will still

17  review it to determine if it will violate the meeting

18  room use policy?

19       MR. GEIGER:  Objection, you're looking for

20  knowledge outside her knowledge as to what other

21  librarians would do.

22       THE WITNESS:  If the staff at the library had a

23  question about how to interpret about what was in the

24  application, would refer it to me, and, again, I would

25  refer it to my supervisor.

11

1          MR. CHANDLER:  Q.  Have you received any

2     questions from any of the librarians that work underneath

3     you or work for you about whether or not a certain

4     application constitutes a religious service?

5          MR. GEIGER:  Objection, vague.

6          THE WITNESS:  We received an application, and I

7     don't remember the time frame, where, yes, there was a

8     question about whether it did.  And, again, it was

9     referred to me, and I referred it to my supervisor who

10    referred it to County Counsel.

11         MR. CHANDLER:  Q.  Was that the Faith Center

12    application?

13    A.    Yes, it was.

14    Q.    Have you received any other applications?

15    A.    No.

16    Q.    So Faith Center is the only applicant, to your

17    knowledge, that the issue of the religious services has

18    come up?

19    A.    To my knowledge.

20    Q.    Okay.  How would you define "religious service"?

21         MR. GEIGER:  Objection, relevance.  Document

22    speaks for itself.

23         THE WITNESS:  I don't have a definition of

24    religious service.

25         MR. CHANDLER:  Q.  Are you familiar with the

                                                            12

1   Faith Center Evangelical Ministries?

2             MR. GEIGER:  Objection, vague.

3             THE WITNESS:  Only in the context of this

4   situation.

5             MR. CHANDLER:  Q.  So you're aware then that

6   they have used the Antioch meeting room before?

7        A.   Yes.

8        Q.   Do you recall when you first became aware that

9   Faith Center used the Antioch meeting room or was

10  planning on using the Antioch meeting room?

11       A.   When this issue was brought to my attention by

12  staff there.  I'm sorry, I can't remember specifically

13  when it was.

14       Q.   Was it prior to the lawsuit being filed?

15       A.   Yes.

16       Q.   Do you remember who on the staff brought it to

17  your attention?

18       A.   No, I'm sorry, I don't.

19       Q.   Did you speak with somebody from the Faith

20  Center prior to the lawsuit being filed?

21       A.   Yes, I did.

22       Q.   Who did you speak with?

23       A.   Pastor Hopkins.

24       Q.   What did you and Pastor Hopkins discuss?

25       A.   We discussed her concern over why she was not

1    going to be permitted to use the meeting room in the

2    future.

3            And I attempted to explain County policy

4    regarding that.

5            She expressed her concerns over that, and I did

6    indicate that the matter had been referred to County

7    Counsel for opinion.

8    Q.    So you spoke with her after they had already

9    conducted a meeting?

10   A.    Yes.

11   Q.    And they were planning on conducting more

12   meetings in the future?

13   A.    They wanted to.

14   Q.    Did you discuss at all what Pastor Hopkins and

15   the Faith Center were doing during their meetings?

16           MR. GEIGER:  Objection, vague.  You mean discuss

17   with Pastor Hopkins?

18           MR. CHANDLER:  Yes.  I'll rephrase the

19   question.

20   Q.    When you spoke with Pastor Hopkins, did you and

21   Pastor Hopkins discuss what had happened during the

22   meeting that they had already conducted in the Antioch

23   library meeting room?

24   A.    Yes, we did.

25   Q.    Did she describe the event that she was holding

14

1    at all?

2        A.    No, the discussion was more that we both

3    acknowledged that there had been worship services that

4    had taken place.

5        Q.    So did she describe the service in any way?  Did

6    she say that she had been conducting a sermon?

7        A.    Yes.

8        Q.    Did she tell you anything else that had

9    happening during the meeting?

10       A.    I can't remember.

11       Q.    Okay.  Did she tell you anything about what her

12   sermon was about or what she was talking about?

13       A.    No.

14       Q.    Okay.  And during that conversation, did you

15   inform Pastor Hopkins that the Faith Center would not be

16   allowed to continue using the Antioch meeting room for

17   future religious meetings?

18       A.    I let her know that it had been referred to

19   County Counsel for an opinion, but based on our current

20   policy, it was not an activity that we could permit.

21       Q.    So did you make the final determination that the

22   Faith Center would not be allowed to continue meeting?

23       A.    No.

24       Q.    When was the next time that you remember

25   speaking with somebody from the Faith Center?

15

1      A.   I did not speak with anyone from Faith Center

2 after that.

3      Q.   That was the only conversation you've had with

4 Pastor Hopkins?

5      A.   That I remember.

6      Q.   Okay.  Are you aware if Faith Center has had any

7 additional meeting at the Antioch meeting room since that

8 first one, before you had your conversation with Pastor

9 Hopkins?

10      A.   Since then?

11      Q.   Yes.  Has Faith Center had subsequent meetings

12 at the Antioch Library?

13      A.   I understand that they have submitted

14 applications and have been scheduled to hold meetings.  I

15 don't know if those meetings have taken place.

16          MR. CHANDLER:  Okay.  I don't think I have any

17 more questions.

18          Do you have anything?

19          MR. GEIGER:  I don't have anything.

20          MR. CHANDLER:  All right.  I think we're done.

21          (Deposition adjourned at 9:15 a.m.)

22                     ---oOo---

23

24

25

                                                              16

```
                    CERTIFICATE OF REPORTER

         I, JANICE M. SMITHSON, a Certified Shorthand

Reporter, hereby certify that the witness in the

foregoing deposition was by me duly sworn to tell the

truth, the whole truth and nothing but the truth in the

within-entitled cause;

         That said deposition was taken down in

shorthand by me, a disinterested person, at the time and

place therein stated, and that the testimony of the said

witness was thereafter reduced to typewriting, by

computer, under my direction and supervision;

         That before completion of the deposition,

review of the transcript (X) was ( ) was not requested.

If requested, any changes made by the deponent (and

provided to the reporter) during the period allowed is

appended hereto.

         I further certify that I am not of counsel

or attorney for either or any of the parties to the said

deposition, nor in any way interested in the event of

this cause, and that I am not related to any of the

parties thereto.

         DATED: _____/__ly 31_____, 2008


                _____/riu M. S_____

                JANICE M. SMITHSON, CSR 5916
```

17