# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

FAITH CENTER CHURCH EVANGELISTIC

MINISTRIES, et al.,

       Plaintiffs,

# ORIGINAL

   vs.                    No. C 04-3111 JSW

FEDERAL D. GLOVER, et al.,

       Defendants.

_____/

DEPOSITION OF

LISA LOOMIS

_____

July 16, 2008

REPORTED BY: JANICE M. SMITHSON, CSR 5916

JOB NO. 411109

**Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)**

INDEX

EXAMINATION BY:                                    PAGE

    MR. CHANDLER                                    5

    MR. GEIGER                                    21

FURTHER EXAMINATION BY:

    MR. CHANDLER                                    21

---oOo---

E X H I B I T S

(No exhibits marked in this transcript.)

---oOo---

**Merrill Legal Solutions**
**(800) 869-9132**

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4    FAITH CENTER CHURCH EVANGELISTIC

     MINISTRIES, et al.,

5

          Plaintiffs,

6

     vs.                        No. C 04-3111 JSW

7

     FEDERAL D. GLOVER, et al.,

8

          Defendants.

9    _____/

10                 ---oOo---

11        BE IT REMEMBERED that, pursuant to Notice,

12   and on Wednesday, July 16, 2008, commencing at 3:03 p.m.

13   thereof, at the OFFICE OF THE COUNTY COUNSEL,

14   Administration Building, 651 Pine Street, 9th Floor,

15   Martinez, California 94553, before me, JANICE M.

16   SMITHSON, a Certified Shorthand Reporter, personally

17   appeared

18                  LISA LOOMIS,

19   called as a witness by the Plaintiffs, who, having been

20   first duly sworn, was examined and testified as follows:

21

22

23

24

25

1               A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3    LAW OFFICE OF ALLIANCE DEFENSE FUND

     101 Parkshore Drive, Suite 100

4    Folsom, California 95630

     By:  TIMOTHY D. CHANDLER, Attorney at Law

5          and DAVID MORRELL, Law Clerk

6

     FOR THE DEFENDANTS:

7

     LAW OFFICE OF CONTRA COSTA COUNTY

8    Office of the County Counsel

     651 Pine Street, 9th Floor

9    Martinez, California 94553

     By:  THOMAS L. GEIGER, Attorney at Law

10

                 ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    4

EXAMINATION BY MR. CHANDLER

MR. CHANDLER:  Q.  Good afternoon, Ms. Loomis.
Have you ever had your deposition taken before?

A.   No.

Q.   Okay.  As you're aware, you were just sworn in,
which means that everything you say is under oath just as
if you were giving testimony in court.

I'm going to ask you a few questions, and just
answer to the best of your ability.  If you're not sure
of the answer, you don't know, go ahead and say so.  If
something I say is unclear or imprecise, you don't
understand my question, feel free to ask me to state it
again or rephrase it, and I'm happy to do that.

Your attorney may object to some of my
questions.  Go ahead and let him finish his objection,
and then you can go ahead and answer my question unless
he specifically directs you not to answer it.

Everything is being transcribed by the court
reporter, so we'll have a written transcript of what we
say, so it's important that we are clear and audible
without -- so we don't want to nod our heads or shake our
head or say uh-uh or uh-huh, but use yes or no.  And we
want to try to avoid talking over each other so it's
easier to write down what we're saying, and it makes the
transcript easier to read.

5

1        If you want to take a break, let me know.  I

2   think it will be pretty quick; I don't want to keep you

3   too long.  But if you need a break, let me know, we can

4   do that.

5        Do you have any questions before we begin?

6   A.   No.

7   Q.   Could you state your name and spell it for the

8   record, please?

9   A.   Lisa Loomis, L-i-s-a L-o-o-m-i-s.

10  Q.   Thank you.

11       And besides your attorney, did you discuss this

12  deposition with anyone?

13  A.   Very briefly.

14  Q.   Who did you discuss it with?

15  A.   With Rita Galindo.

16  Q.   Who is Ms. Galindo?

17  A.   Branch librarian of the Antioch Library.

18  Q.   Is she a supervisor?

19  A.   Yes.

20  Q.   What did you two discuss?

21  A.   She told me to bring a book, and she thought

22  that there one of your questions was kind of strange,

23  but --

24  Q.   Which one was that?

25  A.   Just that if we had prepared for this, so that

1  was it.

2     Q.   If you had prepared for this deposition?

3     A.   Yes.  She thought it was a strange question.

4     Q.   Well --

5     A.   Maybe I shouldn't.

6     Q.   No.  I appreciate your honesty, and if it makes

7  you feel better, it's a question I ask everybody.

8     A.   Okay.

9     Q.   The book is pleasure reading, it has nothing to

10  do with the case, I assume?

11     A.   Correct.

12     Q.   Did you review any materials in preparation for

13  this deposition?

14     A.   I read one email.

15     Q.   What email was that?

16     A.   It was an old email that I sent in May of 2004

17  to Patty Chan, Laura O'Donoghue, and I believe Jenna and

18  Jackie.  Jackie Higgins.  I don't know Jenna's last name.

19         MR. GEIGER:  If I can interject for a second.

20  It's the same email that we were talking about

21  yesterday.

22         MR. CHANDLER:  I'll get to that in my questions.

23         MR. GEIGER:  Okay.

24         MR. CHANDLER:  Q.  And all of those people that

25  you named are the library employees?

1      A.   Yes, uh-huh.

2      Q.   What did you say in those emails?

3      A.   Just one.

4      Q.   I'm sorry, that email.

5      A.   It was kind of a summary, talking -- a summary

6   of what happened that day that the group used the meeting

7   room.

8      Q.   When you say "the group," what group are you

9   referring to?

10      A.   Faith Center.  I don't remember.

11      Q.   The Faith Center?

12      A.   Yes.

13      Q.   That's --

14      A.   With Pastor Hopkins and Mary Ward.  That's what

15   I remember.  I don't remember their official name of the

16   church.

17      Q.   Faith Center is kind of our shorthand name for

18   them, so that will work.

19      A.   Okay.

20      Q.   Okay.  Well, we will likely get into that a

21   little bit later.

22           Let me ask you a couple more general questions:

23   How long have you been employed at the Antioch Library?

24      A.   Approximately seven years.

25      Q.   What is your job title?

8

1     A.    Library assistant.

2     Q.    How long have you been in that position?

3     A.    Well, I've been a library assistant for all of

4  the seven years.  I started as a substitute, and then for

5  the past six, have been in Antioch permanently.

6     Q.    So, as a substitute, did you go to different

7  branches?

8     A.    Yes.

9     Q.    Okay.  What are your primary job duties?

10    A.    A little bit of everything.  Checking in books,

11 checking out books, helping patrons find material they

12 are looking for.  Helping people use the computers.

13 Planning for rooms, doing story time, everything.

14    Q.    Okay.  Well, speaking of the programs and things

15 at the library, or that you mentioned, does the Antioch

16 Library sponsor events for the community, like children's

17 events or a meet the author, those types of events?  Does

18 the Antioch Library sponsor those kinds of events?

19    A.    The Friends -- as far as when you are talking

20 sponsor, I'm thinking money, so it's usually the Friends

21 of the Antioch Library.

22    Q.    Okay.  And does the library staff actually put

23 the events on?

24    A.    Yes.

25    Q.    And does the library ever, do you ever use the

9

1   meeting room for those events?

2       A.   Yes.

3       Q.   And are they all reading-related or

4   book-related?

5       A.   No.

6       Q.   Can you think of some examples of events that

7   wouldn't be reading-related or book-related that you've

8   participated in?

9       A.   We had tween and teen kind of parties

10  celebrating National Hot Tub Month and National Ice Cream

11  Month.

12      Q.   That sounds fun.

13      A.   So we're making ice cream and having hot dogs.

14      Q.   That sounds like a very fun event.

15      A.   We tell them about the summer reading program,

16  so we throw in literacy-type information, but the whole

17  program itself wasn't literacy based.

18      Q.   Okay.  Can you think of any other similar types

19  of events that the libraries put on?

20      A.   We have clowns, singers, things like that.

21      Q.   So if you're going to have a clown come to the

22  library, describe what that event might be like.

23      A.   Well, one we had, he came in his, looked like a

24  regular person, came in streetclothes, and talked a

25  little bit about what it was like to be a clown and what

Merrill Legal Solutions
(800) 869-9132

1    do the kids associate with clowns.

2         And they said, you know, the big feet and the

3    pants, the big baggy pants and makeup and hair and nose,

4    so as they were talking, he would get into costume so

5    they could see his transformation.

6         Q.   Sounds fun, too.

7         A.   And then he would, I'm sorry, balloon tricks or

8    a little, I don't know, little tricks.  I can't remember

9    what they were.

10        Q.   And you mentioned a singer.  What kind of event

11   did you have a singer at?

12        A.   There's some that like promote the summer

13   reading program.  This year it's Catch the Reading Bug,

14   so they are usually singing songs about bugs.

15        Q.   And this is something that's done while the

16   library is open, and it's just the general community is

17   invited.  Is that accurate?

18        A.   Yes.

19        Q.   Okay.  Can you think of any other examples?

20        A.   We had the Black Diamond Mines, a naturalist

21   from Black Diamond Mines come and talk about tarantulas,

22   and another time they came to talk about snakes.  They

23   are going to be talking about owl pellets.

24        Q.   I have a three year old that loves snakes.  I

25   could just picture his eyes lighting up for that kind of

11

1   event.

2       A.    Yes, the kids love it.

3             MR. GEIGER:   Just the pellets?

4             THE WITNESS:   They are going to dissect them.

5             MR. GEIGER:   Okay.

6             MR. CHANDLER:   I'm not going to ask any more

7   questions about that.

8       Q.    I just wanted to ask you a couple more general

9   questions about the meeting room.  Are groups allowed to

10  use the meeting room in the Antioch Library when the

11  library is not open?

12      A.    Yes.

13      Q.    And if a group has reserved the meeting room in

14  the Antioch Library for a time when it's not open, how

15  does the group get access to the room?

16      A.    They come in up to a day in advance of their

17  scheduled date to pick up the key, and that will let them

18  into the meeting room.

19      Q.    Does the key give them access to the entire

20  library?

21      A.    No.

22      Q.    Just the meeting room?  Is there just one door

23  to get into the meeting room?

24      A.    It would let them into the front doors of the

25  library, and then to the meeting room door, and to the

                                                        12

1   bathroom doors, but then there's another door that's

2   locked into the main part of the library that does not

3   open with that key.

4       Q.   Is that the only door to get into the meeting

5   room from?

6       A.   There's another door to the back, but we don't

7   use that to go in and out of.

8       Q.   The back of the meeting room?

9       A.   Correct.

10      Q.   And when a group is using the meeting room when

11  the library is closed, is there a librarian that's

12  required to be present?

13      A.   I'm sorry.  Could you repeat the question?

14      Q.   When a group is using the meeting room when the

15  library is closed, does a librarian have to be at the

16  library while they are there?

17      A.   No.

18      Q.   Okay.  Let's talk a little bit about Faith

19  Center.  Are you familiar with the Faith Center group?

20      A.   I've met Pastor Hopkins and Mary Ward.

21      Q.   And the Faith Center has held meetings at the

22  Antioch Library meeting room?

23      A.   I don't know how many; I just know of the one.

24      Q.   And when was that meeting?

25      A.   In May of 2004.

1    Q.   Okay.  And, to your recollection, did that

2    meeting in May of 2004 violate the library's meeting room

3    use policy?

4    A.   I believe that it did.

5    Q.   And what aspect of the meeting room use policy

6    do you believe that it violated?

7    MR. GEIGER:  Objection.  Are we talking about

8    the -- vague, are we talking about the meeting room

9    policy in place at the time of that meeting or the

10   subsequent one?

11   MR. CHANDLER:  Q.  Well, it would be the meeting

12   room policy that was in effect at the time that the

13   meeting took place.

14   A.   I don't know if -- how the wording has changed,

15   but it just was religious purposes, I thought, and so

16   they were using it for religious purposes, so that would

17   definitely break that policy.

18   Q.   Okay.  How did you come to learn that Faith

19   Center was conducting a religious meeting?

20   A.   I noticed that there was a lot of noise coming

21   from the room, and didn't know who was there, so looked

22   into the calendar to see what was going on and why there

23   was someone there.

24   Q.   I'm sorry.  I didn't hear the last part.

25   A.   Why there was someone in the meeting room and

14

1   what they were doing to be so loud.

2       Q.   So did you overhear what was going on during the

3   meeting?

4       A.   I assume I did, but I can't remember.  I just

5   remember thinking they were being loud.

6       Q.   So were they talking?  Were they singing?  Do

7   you remember what they were doing?

8       A.   I don't remember.

9       Q.   Okay.  Do you remember where you were in the

10  library when you heard them?

11      A.   I believe when I first noticed them, I was in

12  the staff room.

13      Q.   Okay.  And did you notify anybody from Faith

14  Center that the meeting they were holding violated the

15  meeting room use policy?

16      A.   Yes.

17      Q.   Who did you speak with?

18      A.   Pastor Hopkins and Mary Ward.

19      Q.   Did that conversation occur in the meeting room?

20      A.   No.

21      Q.   Where did it occur?

22      A.   In the staff room.

23      Q.   In the staff room, you said?

24      A.   Uh-huh.

25      Q.   Okay.  Were there any other library employees

1    with you?

2        A.    Yes.

3        Q.    Who?

4        A.    Jenna Biglow.  That's her last name.  I couldn't

5    remember it earlier.

6        Q.    Could you spell Biglow for us?

7        A.    I believe it's B-i-g-l-o-w.

8        Q.    Before your conversation with Pastor Hopkins,

9    did you have any discussions with any other library

10   employees about Faith Center's meeting?

11       A.    Yes, I believe I did.

12       Q.    Do you recall who with?

13       A.    Well, Jenna, and I don't remember if there was

14   anyone else.

15       Q.    When you mentioned earlier that you had sent an

16   email to a number of library employees, did you send that

17   out before or after you had spoken with Pastor Hopkins?

18       A.    After.

19       Q.    Okay.  Do you remember what you discussed with

20   Jenna?

21       A.    I think it was along the lines of I think they

22   are holding a religious meeting in there, what do we do,

23   because I felt that it broke the policy, so I didn't know

24   where to go from there.

25       Q.    And what did you decide to do?

16

1        A.    Well, Jenna called Patty Chan.  At the time, she

2   was the branch manager.

3        Q.    And what did Patty Chan advise you and Jenna do?

4             MR. GEIGER:  Objection, calls for hearsay.

5             MR. CHANDLER:  Go ahead.

6             MR. GEIGER:  Go ahead.

7             THE WITNESS:  I believe they were almost done

8   with their allotted time that they signed up for, so just

9   notify them that they were being loud at the time, and

10  then talk to them after the meeting to let them know they

11  wouldn't be able to use it any more.

12             MR. CHANDLER:  Q.  Are you aware if Faith Center

13  has held any additional meetings at the Antioch Library?

14        A.    I don't know.

15        Q.    Okay.  Do you ever review meeting room use

16  applications to determine if they satisfied the meeting

17  room use policy?

18        A.    No.

19        Q.    Are you ever required to enforce the meeting

20  room use policy as part of your job?

21        A.    Other than that one time, I haven't.

22        Q.    So is that the only instance within which you've

23  ever notified somebody that was using the meeting room

24  that they weren't allowed to be there?

25        A.    Yes.

                                                      17

1     Q.   You said that you had gone and spoken with

2  Pastor Hopkins.  Was that after the meeting was over?

3     A.   Yes.

4     Q.   Did you, prior to speaking with her, did you

5  hear anything that was going on with the meeting as

6  you're waiting for it to finish?

7          MR. GEIGER:  Object, vague.

8          THE WITNESS:  I can't remember.

9          MR. CHANDLER:  Q.   When you spoke with Pastor

10  Hopkins, did she discuss with you at all what they were

11  doing in their meeting?

12     A.   I don't remember.

13     Q.   Let's look at Exhibit 4.  This document was

14  marked as Exhibit 4 in the previous deposition.  Do you

15  remember it?

16     A.   Uh-huh, yes.

17     Q.   Can you tell me what it is?

18          MR. GEIGER:  Objection, the document speaks for

19  itself.

20          THE WITNESS:  Policy for the use of meeting

21  rooms and libraries.

22          MR. CHANDLER:  Q.   Do you know if this is the

23  current policy?

24     A.   I do not know.

25     Q.   Can you look at the section that's labeled

18

1    "religious use"?

2        A.   Yes.

3        Q.   As written, the policy prohibits all religious

4    services.  Is that correct?

5        A.   "Library meeting room should not be used for

6    religious services."

7        Q.   To your knowledge, is the the term "religious

8    service" defined in any library policy?

9            MR. GEIGER:  Objection, relevance.

10           MR. CHANDLER:  Q.  Do you want me to repeat the

11   question?

12       A.   Please.

13       Q.   To your knowledge, is the term "religious

14   service" defined in any library policy?

15       A.   Not to my knowledge.

16       Q.   Have you ever received any instruction or

17   guidance on what the term "religious service" means?

18           MR. GEIGER:  Objection, relevance.

19           THE WITNESS:  At the time or since then?

20           MR. CHANDLER:  Q.  At any time.

21       A.   A little bit more since this, since this

22   incident.

23       Q.   What was that instruction that you received?

24       A.   I guess it was trying to clarify exactly,

25   religious service being like a church service where

1    people would go on a Sunday and go to church and hear a

2    sermon, compared to Bible study.

3         Q.   So is it your understanding that a group cannot

4    use a meeting room for a sermon?

5         A.   That's my understanding, yes.

6         Q.   What is the difference between a sermon and a

7    Bible study?

8              MR. GEIGER:  Objection, relevance.

9              THE WITNESS:  Other than I've been told they

10   can't use it for church service, and they can for Bible

11   study.

12             MR. CHANDLER:  Q.  Do you recall who told you

13   that?

14        A.   Rita Galindo.

15        Q.   How would you define a religious service?

16             MR. GEIGER:  Objection, relevance.

17             THE WITNESS:  I don't know.

18             MR. CHANDLER:  Q.  Okay.  Going back, when you

19   met with Pastor Hopkins to let her know that the Faith

20   Center would not be allowed to meet in the meeting room

21   any more for religious meetings, do you know who made the

22   final decision to exclude Faith Center from the meeting

23   room?

24        A.   That day or since then?

25        Q.   Well, that day.

1      A.    As far as -- I assume Patty Chan Jenna talked

2   to, and Patty said to let them know they wouldn't let

3   them use it any more, so as far as my understanding, that

4   day Patty made the decision.

5            MR. CHANDLER:  Do you have anything?

6                 EXAMINATION BY MR. GEIGER

7            MR. GEIGER:  Q.  Just, if I could, I mean there

8   is a distinction between the Friends of the Library and

9   the County Library.

10           MR. CHANDLER:  You're welcome to ask questions.

11           MR. GEIGER:  Q.  Just if you could explain the

12  distinction between Friends of the Library and the County

13  Library.

14           A.    Oh, because they are supposed to be separate,

15  and he asked about sponsoring.  And the money, most of

16  the time when we have programs, we use Friends of the

17  Library' money so it doesn't come from the County money.

18           Q.    And Friends of the Library, what exactly is

19  that?

20           A.    Non-profit organization that volunteers at the

21  library and raises money to support programs and video

22  reels and furniture and whatever else the library needs.

23           MR. GEIGER:  Okay, thanks.

24              FURTHER EXAMINATION BY MR. CHANDLER

25           MR. CHANDLER:  Q.  And so that I understand, the

21

1    Friends of the Library, you rely on them as much as

2    possible to fund these special events that are put on in

3    the library?

4        A.   Yes.

5        Q.   Do the Friends of the Library provide staffing

6    for those, to help with those events?

7        A.   No.   They usually volunteer during things like

8    book sales.   They have book sales where they sell donated

9    books that raises money to help support the library, and

10   they provide the staffing for that.

11       Q.   Okay.   And when, for example -- I'm stuck on the

12   owl thing -- or when they come and do a presentation on

13   the lizards or the clown comes, do the Friends of the

14   Library come and help with that, or is that just

15   something that the library staff handles?

16       A.   Library staff is there.   The Friends of the

17   Library staff is not.

18           MR. CHANDLER:   Okay.

19           Tom, did you have anything else?

20           MR. GEIGER:   No.

21           MR. CHANDLER:   I'm done then.

22           (Deposition adjourned at 3:28 p.m.)

23                    ---oOo---

24

25

                                                              22

CERTIFICATE OF REPORTER

2            I, JANICE M. SMITHSON, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth and nothing but the truth in the

6    within-entitled cause;

7            That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12           That before completion of the deposition,

13   review of the transcript (X) was ( ) was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed is

16   appended hereto.

17           I further certify that I am not of counsel

18   or attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22           DATED: _____July 31_____, 2008

23

24           _____Janice M. Smithson_____

25           JANICE M. SMITHSON, CSR 5916