**EXHIBIT E**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FAITH CENTER CHURCH           )
EVANGELISTIC MINISTRIES,      )
et al.,                       )
                              )
              Plaintiffs,     )
      vs.                     ) Case No. C04-3111 JSW
                              )
FEDERAL D. GLOVER, et al.,    )
                              )        ORIGINAL
              Defendants.     )
                              )

DEPOSITION OF

PATTY CHAN

———————————

July 15, 2008

Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#411108]

**M E R R I L L   L E G A L   S O L U T I O N S**

135 Main Street, 4th Floor
San Francisco, CA 94105

415.357.4300 Tel

www.merrillcorp.com/law

1               I N D E X

2           INDEX OF EXAMINATIONS

3   EXAMINATION BY MR. CHANDLER ........................4

4           (No exhibits were marked.)

5                 --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        --oOo--
2          Deposition of PATTY CHAN, taken by the
3     Plaintiffs at 651 Pine Street, 9th Floor, Martinez,
4     California, commencing at 1:01 p.m. on July 15, 2008,
5     before CAROLYN M. MANN, CSR, pursuant to Notice.
6                        --oOo--
7                  A P P E A R A N C E S
8     FOR THE PLAINTIFFS:
9               ALLIANCE DEFENSE FUND
                101 Parkshore Drive
10              Suite 100
                Folsom, California  95630
11              BY:   TIMOTHY D. CHANDLER
                      JOEL OSTER
12
      FOR THE DEFENDANTS:
13
                CONTRA COSTA COUNTY
14              OFFICE OF THE GENERAL COUNSEL
                651 Pine Street
15              Ninth Floor
                Martinez, California  94553-1229
16              BY:   THOMAS L. GEIGER
17                        --oOo--
18
19
20
21
22
23
24
25

                                                            3

1          MARTINEZ, CALIFORNIA

2          TUESDAY, JULY 15, 2008

3              1:01 P.M.

4              --oOo--

5            PATTY CHAN

6    _____

7    called as a witness, who, having been first duly sworn,

8    was examined and testified as follows:

9              --oOo--

10        EXAMINATION BY MR. CHANDLER

11        MR. CHANDLER:  Q.  Have you ever had your

12   deposition taken before, Miss Chan?

13        A.   No.

14        Q.   Okay.  As you're aware, you were just sworn

15   in, which means that everything that you say here will

16   be under oath, just as if you were giving testimony in

17   court.  I'm going to ask you a series of questions, and

18   answer them to the best of your knowledge.  If you don't

19   know, just say so.

20        A.   Okay.

21        Q.   Don't need to guess or anything.  I'm going to

22   try to keep my questions clear and concise for you, but

23   if you don't understand something, feel free to ask me

24   to clarify.  And your attorney may object to some of the

25   questions, but unless he specifically tells you

1    otherwise, go ahead and answer it once he's done

2    objecting.

3          And your answers need to be clear and concise,

4    or clear and audible so that the court reporter can

5    write everything down that we're saying.  And we want to

6    try to avoid speaking over each other.  So if you could

7    let me finish my question, and then I'll let you finish

8    your answer, so we're not talking over each other, it

9    will just make it --

10         A.    Okay.

11         Q.    -- easier for her to record everything.  And

12   don't nod or shake your head.  "Yes" or "no," not

13   "uh-huh" or "huh-uh," because that's, when you're

14   reading it, it's hard to know what that means, so . . .

15         If you need to take a break, let me know.

16   That will be fine.

17         Do you have any questions before we begin?

18         A.    No.

19         Q.    Okay.

20         A.    Can you nod and say "no" at the same time?  I

21   mean . . .

22         Q.    That's fine.  As long as we get a "no" on

23   paper, that's all that we need.

24         A.    Okay.

25         Q.    Can you state your name and spell it for the

5

1    record, please.

2         A.    Patty Chan, P-A-T-T-Y, last name C-H-A-N.

3         Q.    Besides your attorney, did you discuss this

4    deposition with anybody?

5         A.    My supervisor, to let her know that I would be

6    here today.

7         Q.    Who is your supervisor?

8         A.    My supervisor is Gail McPartland.

9         Q.    And did you discuss anything about what you

10   would be saying in the deposition?

11        A.    No.

12        Q.    It was just to let her know scheduling-wise --

13        A.    Yeah.

14        Q.    -- what you were doing?  Okay.

15              Did you review any materials or paperwork?

16        A.    Yes.

17        Q.    What did you look at?

18        A.    I looked at the e-mails from previous staff

19   that were in the library that day of the occurrence in

20   2004.

21        Q.    Did you receive any e-mails from -- which

22   staff?

23        A.    The, the day that the group was in the Antioch

24   library was my day off, was a Saturday.  So I received

25   e-mail from staff about, you know, just a regular

6

1 routine incident type report.

2     Q.   And when you say "the group," are you

3 referring to Faith Center?

4     A.   No.  The staff that worked on Saturday.

5     Q.   Okay.  And who is the staff that was working?

6     A.   It would be Lisa Loomis, Jenna Biglow, and I

7 think Jacqueline Higgins.

8     Q.   Okay.  And you, I think you had said that

9 there was a group that was meeting on that Saturday at

10 the library.  Which group were you referring to?

11     A.   It would be the Faith Center.

12     Q.   And what -- do you recall what those e-mails

13 said?

14     A.   It was just factual, describing what happened,

15 and at the end there was an instruction to follow up on

16 it with the Faith Center.

17     Q.   And who gave that instruction?

18     A.   It was in the e-mail from Lisa Loomis.

19     Q.   So Lisa Loomis was giving instruction to

20 follow up with Faith Center, or were you giving her

21 instructions?

22     A.   She was in the building at the time and I

23 wasn't, so there were clerks and then there were library

24 assistants.  So Lisa Loomis was the library assistant.

25 So she had higher classification than the clerks.

7

1    Q.    So Lisa was the most, was she the most senior
2    person in the library --
3    A.    I think so, yeah.
4    Q.    -- that day?
5          So she was instructing somebody else to follow
6    up with Faith Center?
7    A.    Well, I'm her, Lisa Loomis's supervisor, so
8    since I wasn't there, she was just letting her
9    supervisor know what had happened in the building.
10   Q.    So what did she tell you?
11   A.    She just said that she spoke to the person, I
12   think the person in charge at the Faith Center, and that
13   she reported that she would let her know what had
14   happened and that I would call her back the next day I
15   came back to work.
16   Q.    That you would call the Faith Center
17   representative --
18   A.    Yes, uh-huh.
19   Q.    -- back?   Okay.
20         And did Lisa or anybody else describe to you
21   what happened during the Faith Center meeting, what they
22   were doing?
23   A.    Yes, in the e-mail.
24   Q.    And what did she say?
25   A.    She just --

8

1       MR. GEIGER:  I'm going to object.  It calls

2   for hearsay.

3       Go ahead.  You can answer now.

4       THE WITNESS:  Oh.  What did she say happened

5   in the e-mail?

6       MR. CHANDLER:  Q.  Yeah.  What, what did she

7   tell you had happened during the Faith Center meeting?

8       A.  She just said that they were in the building

9   and they heard noise coming from the conference room,

10  the meeting room.  So they went into the room to let

11  them know that the noise level had carried into the

12  library and that they needed to, you know, maybe they

13  weren't aware that it was noisy and that there were

14  other people in the library, and they just needed to

15  keep the noise level down.  And she looked on the

16  meeting room calendar to see which group was in the

17  room.  And it had -- I forget the exact name, but it

18  showed that they were in the room.  So they were

19  scheduled.  And then I guess they had another meeting

20  scheduled and she mentioned that.  So they didn't,

21  they -- I don't know if they did keep the noise level

22  down, but what she did was she called me on my day off

23  to explain the situation to me.

24      Q.  So was her only concern the noise level?

25      A.  Her concern was the noise level, and then her

9

1   concern was also that it was a religious service.

2        Q.   And did she tell you anything about what was

3   going on during the meeting other than the noise level?

4   Did she say what they were doing or what they were

5   talking about?

6             MR. GEIGER:  Objection, calls for hearsay.

7             THE WITNESS:  Well --

8             MR. CHANDLER:  Q.  You can answer.

9        A.   Well, that was in 2004.  So I don't remember

10  all of the details of the conversation.  I only have the

11  written description of in her e-mail, and that's why I

12  went back to review it.

13       Q.   And do you recall if the e-mail has any

14  description of what was going on in the e-mail?

15       A.   I didn't bring the e-mail with me.  It just

16  said that there was loud noise, I think she said.  I

17  don't want to say if I don't remember correctly.

18       Q.   But do you still have a copy of the e-mail?

19       A.   Yes.

20       Q.   I don't believe we've got a copy of that.

21            MR. CHANDLER:  It would have fallen within the

22  discovery request, so . . .

23            MR. GEIGER:  I'll take a look at it, but I

24  think we disclosed everything that everybody had.

25            THE WITNESS:  Yeah, it was sent.

1              MR. CHANDLER:  Q.  If you could forward those

2    to your attorney to review, that would be helpful.

3         A.    Okay.

4         Q.    Where are you currently employed?

5         A.    Contra Costa County library.

6         Q.    What's your job title?

7         A.    Community outreach services manager.

8         Q.    And what is your -- what do you do?  What are

9    your job duties?

10        A.    We just -- PR for the library; we go out to

11   different events; we give talks to business groups,

12   senior groups, just to let people know all the different

13   services and materials we have in the library.  We do

14   outreach with Hispanic groups, children's centers,

15   preschools, volunteers.

16        Q.    And is your work focused on the Antioch branch

17   or do you work for the libraries across the county?

18        A.    No, it would be for all the libraries across

19   the county.

20        Q.    Have you -- when did you start in that

21   position?

22        A.    In March of 2005.

23        Q.    And prior to that, where were you working?

24        A.    I was at the Antioch library.

25        Q.    And what was your position there?

11

1        A.    I was the senior branch librarian.

2        Q.    And how long did you work at the Antioch

3    library?

4        A.    I would say since 1979.

5        Q.    So almost 25 years?

6        A.    Yeah.

7        Q.    A little more than.

8        A.    I think it came out to 26 years, yeah.

9        Q.    That's great.  Prior to the Faith Center

10   lawsuit being filed, did you have any communications

11   with anybody from Faith Center?

12       A.    No.

13       Q.    And other than the e-mails that you had

14   mentioned that you had reviewed and the phone call that

15   you had with, with Jenna earlier, did you, have you, did

16   you discuss with any of the other employees the Faith

17   Center meeting prior to the lawsuit being filed?

18       A.    Prior to the lawsuit being filed.  Yes.

19       Q.    Who did you have conversations with?

20       A.    Well, this was on a Saturday, so I went back

21   to work on a Monday.  So we had some discussion from and

22   concerns from the staff that worked on Saturday.

23       Q.    And which staff did you discuss that with?

24       A.    I couldn't correctly say whether I spoke with

25   them on Monday because that staff was part-time, so all

Merrill Legal Solutions
(800) 869-9132

1    three of the ones that worked on Saturday might not have

2    worked on Monday.  But during the next time that they

3    came to work, we discussed it.

4         Q.   And do you recall what you discussed?

5              MR. GEIGER:  Objection, vague.

6              THE WITNESS:  I, again, I don't remember

7    clearly.  I mean, I can maybe generalize, but basically

8    it was the events that had happened on the Saturday.

9    But I had referred the situation to my supervisor to get

10   guidance and input also.

11             MR. CHANDLER:  Q.  And who was that that you

12   referred it to?

13        A.   Laura O'Donoghue.

14        Q.   Okay.  After the lawsuit was filed, have you

15   had any communications with anybody from Faith Center?

16        A.   No.

17        Q.   Do you recall any of the Antioch staff members

18   expressing concerns about the religious aspect of the

19   meeting to you?

20             MR. GEIGER:  Objection, calls for hearsay.

21             THE WITNESS:  Yes.

22             MR. CHANDLER:  Q.  And what were those

23   objections?

24        A.   I would think just based on --

25             MR. GEIGER:  Hold on for a second.  You

                                                        13

1    characterized them as objections in that question.

2    Before, it was expressing concern.  I think there's a

3    difference.

4            MR. CHANDLER:  Q.  Okay.  What were those

5    concerns?  What were the, what were the concerns that

6    the staff members had raised about the religious aspect?

7        A.    I think their main concern was the -- see,

8    we're kind of -- what do you call it -- empowered -- not

9    empowered -- assigned to keep the library a comfortable

10   place for all that come into the library.  And that

11   noise level -- just kind of making it a conducive place

12   for purposes of what a library is for.  So regardless of

13   any other, the, the noise level is a separate issue.  So

14   they were mainly concerned about the noise level.

15       Q.    Do you recall if there were any other

16   restrictions?  At the time when Faith Center had their

17   meeting in 2004, the meeting that we've been discussing,

18   at that time do you recall if there were any other

19   restrictions on what groups could talk about during

20   their meetings at the meeting room?

21       A.    We had a meeting room, a county library

22   meeting room policy.

23            MR. CHANDLER:  Okay.  Can you give her

24   Exhibit 1, please.

25            THE REPORTER:  One?

                                                          14

1          MR. CHANDLER:  Yes, please.

2     Q.   The court reporter has handed you what was

3 marked in an earlier deposition as Exhibit 1.  If you

4 could just take a look at that and tell me if that is

5 the -- to your recollection, is that the policy that was

6 in place, the meeting room use policy that was in place

7 in 2004 when Faith Center had their meeting?

8     A.   Yes.

9     Q.   So using that policy, are there any other

10 restrictions as far as what a, an applicant can use the

11 meeting room for as far as what they can talk about?

12          MR. GEIGER:  Objection, the document speaks

13 for itself.

14          MR. CHANDLER:  Q.  You can go ahead and

15 answer.

16     A.   Could you repeat the question?

17     Q.   Sure.  Let me see if I can rephrase it a

18 little bit better.

19          Based on the meeting room use policy that was

20 in effect in 2004, other than the prohibition on

21 religious, or other than the religious use aspect of

22 that policy, are there any other restrictions on what

23 groups could discuss in the meeting room?

24          MR. GEIGER:  Same objection.

25          THE WITNESS:  It's not specific.  It's just,

15

1    at the top it says it's a policy to encourage the use

2    for "educational, cultural and community-related

3    meetings, programs, and activities."  And then it's got

4    a breakdown of some restrictions.

5              MR. CHANDLER:  Q.  When you were working at

6    the Antioch library, did you -- was it part of your job

7    to review meeting room applications to determine if they

8    could be approved or not?

9         A.    Yes.

10        Q.    How often did you do that?

11        A.    Whenever an application came across the desk.

12        Q.    Was that fairly frequent?  How, roughly how

13   many would you look at in maybe a week period or so?

14        A.    It was pretty frequent.  I would say two to

15   three maybe.

16        Q.    Two to three per week?

17        A.    Yeah, maybe.

18        Q.    Do you recall ever rejecting an application

19   because of something, because it violated this, this

20   policy, the policy in Exhibit 1?

21        A.    Yes.

22        Q.    And can you tell me why, what the basis for

23   one of those rejections was?

24        A.    Gee.  It would be maybe . . .

25        Q.    Let me clarify.

16

1          MR. GEIGER:  If you --

2          MR. CHANDLER:  Q.  Only if you have a specific

3     example that you remember.

4          MR. GEIGER:  Yeah.  If you can't remember, you

5     can't remember.

6          THE WITNESS:  Yeah, I'll try.

7          MR. CHANDLER:  Q.  Do you remember --

8          I'm sorry for talking over you.

9          Do you remember any specific examples where

10    you denied a meeting room application because it was

11    inconsistent with this policy in Exhibit 1?

12         A.   I don't remember one right offhand that's

13    specific.  But if I had questions about denying a

14    meeting room, I would always refer it to my supervisor.

15         Q.   And do you have any, remember any specific

16    examples of questions you had that you gave to your

17    supervisor about the --

18         A.   I'm trying --

19         Q.   -- meeting room use policy?

20         A.   -- to remember.  The meeting room.  Sometimes

21    we would have to deny a group if the room was already

22    booked for those days; you know, they asked for

23    June 16th and it was already booked.  So those were

24    denied.

25         Q.   Okay.  Any other types of examples you can

1    think of?  Again, I mean, let me clarify.

2          MR. GEIGER:  And also, could you be more --

3    example of what?

4          MR. CHANDLER:  Q.  Any type of specific

5    examples.  Not just generalized, but specific examples

6    of applications that were, that, that you determined did

7    not, would not be allowed in the meeting room under the

8    meeting room policy.

9          MR. GEIGER:  If you remember.

10          THE WITNESS:  I remember 7-11 wanted to use

11    the meeting room as a, like a week for their new

12    employee training and we -- you know, there's a charge

13    for it.  So some groups didn't want to pay the charge.

14    I think it was $40 an hour.  And it wasn't available

15    for, you know, five straight days.

16          MR. CHANDLER:  Q.  Okay.  Now, in your current

17    position, do you review meeting room --

18          A.    No.

19          Q.    -- use policies?  Okay.

20          Can you refresh my recollection as far as,

21    when did you say that you changed positions and stopped

22    working in Antioch?

23          A.    March of 2005.

24          Q.    March of 2005.  Okay.  Can you . . .

25          All right.  Can we show her Exhibit 3.

                                                        18

1          I'm handing you what's marked as Exhibit 3.

2     I'd like to direct your attention to the second page.

3     Do you recognize this document?

4          A.    Yes.

5          Q.    Can you tell us what it is?

6          A.    Page -- the second page?

7          Q.    Yes, the second page.

8          A.    Okay.  The second page is a resolution from

9     the board of supervisors dated and adopted on

10    December 14th, 2004.  "Policy for the use of meeting

11    rooms in libraries."

12         Q.    And was this the policy in Exhibit 3, was this

13    in effect while you were working at Antioch library?

14         A.    Yes.

15         Q.    And can you tell me what the policy says about

16    religious uses?

17              MR. GEIGER:  Objection, it speaks for itself.

18              THE WITNESS:  "Religious use.  Library meeting

19    rooms shall not be used for religious services."

20              MR. CHANDLER:  Q.  What -- when you were

21    working at Antioch public library, what was your

22    understanding of the term "religious services"?

23              MR. GEIGER:  Objection that the document

24    speaks for itself.

25              THE WITNESS:  A religious service would be a

1    religious service that . . . It would be a service where

2    you went to church on a Sunday, you go to a service.

3              MR. CHANDLER:  Q.  So how, how did you enforce

4    that policy when you were working at Antioch library,

5    the policy prohibiting religious services?

6              MR. GEIGER:  Objection, lack of foundation.

7              THE WITNESS:  How did I enforce it?

8              MR. CHANDLER:  Q.  Yes.  Did you ever have to,

9    or did you ever apply or inform an applicant that they

10   could not engage in a religious service?

11        A.   I don't, I don't remember.

12        Q.   I'm sorry?

13             MR. GEIGER:  She said, "I don't remember."

14             THE WITNESS:  I don't remember.

15             MR. CHANDLER:  Q.  So did you ever receive any

16   instruction from anybody within the County as far as

17   what a religious service would consist of, or how that

18   was to be enforced?

19             MR. GEIGER:  Objection; vague, compound.

20             THE WITNESS:  You know, when we were hired we

21   had employee training, and I was trained on being a

22   branch librarian by my supervisor, and we went through

23   classes and workshops.  But I don't specifically

24   remember.

25             MR. CHANDLER:  Q.  Yeah, and I don't want to,

                                                          20

1   I don't want to ask you to guess.  If you have -- if you

2   received any specific direction as far as how this is,

3   how this was to be applied, that's all I'm asking for.

4   If you don't remember, that's okay.

5        A.   No, I don't.

6        Q.   Okay.  So your understanding of a religious

7   service, that would consist of anything that would be a

8   service on a, church service on a Sunday; is that

9   your --

10            MR. GEIGER:  Object.

11            MR. CHANDLER:  Q.  -- understanding?

12            MR. GEIGER:  Objection, asked and answered and

13  it's also irrelevant.

14            THE WITNESS:  I, I would just always ask my

15  supervisor if I had any questions or any, any questions

16  on definition or applications on a meeting room use.

17            MR. CHANDLER:  Q.  So you don't know a

18  specific definition for "religious services."

19       A.   No.

20            MR. CHANDLER:  Okay.  All right.  If we want

21  to take a couple minutes, just make sure I covered

22  everything, before we run out.

23            MR. GEIGER:  Okay, come on out.

24            (Whereupon, a recess was taken and the

25            deposition was subsequently adjourned at

21

1          1:32 p.m.)

2                        --oOo--

3          I declare under penalty of perjury that the

4     foregoing is true and correct.  Subscribed at

5     _____, California, this _____ day of

6     _____, 2008.

7

8

9                              _____

10                             PATTY CHAN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22

1    CERTIFICATE OF REPORTER

2         I, CAROLYN M. MANN, a Certified Shorthand

3    Reporter, hereby certify that the witness in the

4    foregoing deposition was by me duly sworn to tell the

5    truth, the whole truth, and nothing but the truth in the

6    within-entitled cause;

7         That said deposition was taken down in

8    shorthand by me, a disinterested person, at the time and

9    place therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12        That before completion of the deposition,

13   review of the transcript [X] was [ ] was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22        DATED:    7/28/08

23

24

25        CAROLYN M. MANN, CSR No. 10066