**EXHIBIT F**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FAITH CENTER CHURCH          )
EVANGELISTIC MINISTRIES,     )
et al.,                      )
                             )
            Plaintiffs,      )
    vs.                      ) Case No. C04-3111 JSW
                             )
FEDERAL D. GLOVER, et al.,   )
                             )
            Defendants.      )
                             )

# ORIGINAL

DEPOSITION OF

JENNA BIGLOW

July 17, 2008

Transcript was not signed
by the Witness within the
statutory period, in accordance
with Federal Rule 30 (e)

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#411110]

**M E R R I L L   L E G A L   S O L U T I O N S**

www.merrillcorp.com/law    135 Main Street, 4th Floor
San Francisco, CA 94105          415.357.4300 Tel

1                          I N D E X

2                    INDEX OF EXAMINATIONS

3    EXAMINATION BY MR. CHANDLER ........................  4

4                  (No exhibits were marked)

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Merrill Legal Solutions
(800) 869-9132

1                         --oOo--

2            Deposition of JENNA BIGLOW, taken by the

3    Plaintiffs at 651 Pine Street, 9th Floor, Martinez,

4    California, commencing at 9:10 a.m. on July 17, 2008,

5    before CAROLYN M. MANN, CSR, pursuant to Notice.

6                         --oOo--

7                 A P P E A R A N C E S

8    FOR THE PLAINTIFFS:

9            ALLIANCE DEFENSE FUND

             101 Parkshore Drive

10           Suite 100

             Folsom, California  95630

11           BY:   TIMOTHY D. CHANDLER

12   FOR THE DEFENDANTS:

13           CONTRA COSTA COUNTY

             OFFICE OF THE GENERAL COUNSEL

14           651 Pine Street

             Ninth Floor

15           Martinez, California  94553-1229

             BY:   THOMAS L. GEIGER

16

                         --oOo--

17

18

19

20

21

22

23

24

25

                                                        3

1              MARTINEZ, CALIFORNIA

2          THURSDAY, JULY 17, 2008

3                 9:10 A.M.

4                 --oOo--

5              JENNA BIGLOW

6        _____

7    called as a witness, who, having been first duly sworn,

8    was examined and testified as follows:

9                 --oOo--

10           EXAMINATION BY MR. CHANDLER

11           MR. CHANDLER:  Q.  Good morning.

12      A.   Good morning.

13      Q.   Have you ever had your deposition taken

14   before?

15      A.   No.

16      Q.   Well, you were just sworn in, which means

17   everything you say is under oath, so it's just like

18   you're testifying in court.

19           I'm going to ask you a series of questions.

20   Answer them to the best of your knowledge.  If you don't

21   know, go ahead and say so.  Don't try to guess or

22   anything.

23           If you don't understand my questions,

24   something's not clear, go ahead and ask me to rephrase

25   it or restate it.  That's not a problem.

                                                          4

1          The court reporter is going to be writing down

2    everything that we say, so it's important that we try

3    not to talk over each other.  If you'll let me finish my

4    questions, and then your attorney may raise an objection

5    to my question.  Go ahead and let him do that, if he

6    does.  And then unless he advises you otherwise, go

7    ahead and answer the question.

8          Try to avoid shaking your head or saying

9    "uh-huh" or "huh-uh" so that we can get everything

10    written down so it's clear what you're saying.

11          If you need a break at any point, let me know.

12    I think this will go pretty quickly, so hopefully that

13    won't be necessary, but if you need one, that's fine.

14          Do you have any questions before we begin?

15    A.    So you're an attorney and he's an attorney?  I

16    just want to make sure I . . .

17    Q.    Yes, that's right.

18    A.    Okay, okay.

19          MR. GEIGER:  I'm the library's attorney and

20    he's the plaintiff's attorney.

21          THE WITNESS:  Okay.  Got it.

22          MR. CHANDLER:  Q.  Anything else?

23    A.    No.

24    Q.    Could you state your name and spell it for the

25    record.

1        A.    Jenna, J-E-N-N-A, Biglow, B-I-G-L-O-W.

2        Q.    And besides your attorney, Mr. Geiger here,

3    did you discuss this deposition with anybody else?

4        A.    No.

5        Q.    Did you review any materials before you came

6    in preparation for this deposition?

7        A.    No.

8        Q.    And where are you currently employed?

9        A.    At Moraga library.

10        Q.    And how long have you been employed at that

11    library?

12        A.    About three years.

13        Q.    Where were you employed before that?

14        A.    The Antioch library.

15        Q.    And what was your job at the Antioch library?

16        A.    Experience level clerk.

17        Q.    And what were your job duties as an experience

18    level clerk?

19        A.    To post, like, job postings or notices that

20    come for special activities on bulletin boards; phone

21    books, I had to put the phone books out; calling people

22    in regard to when only part of a set is returned rather

23    than the whole thing.  This is a long time ago.  Of

24    course, checking things out to people, checking things

25    in; and monitoring the library areas, making sure that

1    rules are being followed.  If not, you know, state that

2    the rules aren't being followed.  And -- god, it seems

3    like I did so much and now it sounds so little.  I can't

4    remember what else.  That's mostly . . .

5        Q.    Did you review meeting room use applications?

6        A.    No.

7        Q.    Did you enforce the meeting room rules when

8    people were using the meeting room?

9        A.    If we saw something that wasn't correct, that

10   was with all library employees, it was just understood

11   that you would address that, according to -- try to just

12   use your common sense and, you know, inform the

13   supervisor or what-have-you.

14       Q.    And what is your title at the Moraga library?

15       A.    The same thing, experience level clerk.

16       Q.    And are your duties any different there?

17       A.    Well, now I do processing of magazines, which

18   is different from what I used to do, and negotiate a lot

19   more customer service negotiations with accounts that

20   people don't agree with, you know, with our accounts,

21   they don't agree with fines owed or things like that.

22   And other than that, yeah, a lot of the same things.

23       Q.    And does the Moraga library have a meeting

24   room?

25       A.    Yes, it does.

7

1      Q.    And does it use the same meeting room policy

2  from the county that the Antioch library uses?

3      A.    Yes, yes.  It's county-wide.

4      Q.    I'm going to ask you some questions about your

5  time at the Antioch library, since that's more about

6  this lawsuit is dealing with.  So --

7      A.    Okay.

8      Q.    -- I'll try to have you think back to your

9  time there.  Do you remember if the Antioch library put

10  on community events at the library?

11      A.    Yeah.  I mean, we had special little events,

12  you know, that would happen.  Just, like, we would hire

13  a, you know, maybe a clown, for instance, to come and

14  incorporate that with story times; you know, that were

15  out of the ordinary, just out of the ordinary of the --

16  but, you know, usually it was an event or like some sort

17  of crafts or, I mean, just different events.

18      Q.    So were they all reading-related?

19      A.    I mean, yeah.  That's the gist of what you're

20  trying to promote is reading.  So somewhere in there,

21  reading was promoted.  Like, even if someone came in and

22  brought some animals, reading was promoted through, by

23  having the animals there.  You know, of course, you

24  know, you know, trying to get kids to read more

25  nonfiction books about the wildlife.

8

1      Q.    What kind of animals did people bring in?

2      A.    Well, one time we had a guy that brought a

3  pig, and I don't even remember what else he brought.

4  And he was just, like, a special person that came in

5  and, you know, made it seem fun.  And I forget; he came

6  with other things other than a pig.  I don't remember

7  what.

8      Q.    And do you remember if --

9            MR. GEIGER:  I'm sorry.  Just, I was thinking

10  of the deposition yesterday, about the owls.

11            THE WITNESS:  There was an owl that was

12  brought in?

13            MR. GEIGER:  I think it's an upcoming program

14  out there, but -- I'm sorry.

15            MR. CHANDLER:  It's okay.

16      Q.    Do you remember if the, if the Antioch library

17  used the meeting room for some of those events?

18      A.    Yes, yes.  We always used -- I mean, for the

19  most part, we'd use the meeting room for any events.

20      Q.    Besides -- you mentioned the clown and the

21  animals.  Do you remember any other types of events like

22  that that the Antioch library held?

23      A.    God.  My mind is blank.  Sorry.

24      Q.    That's okay.  I know it's been a while.

25  That's okay.  Are you familiar, do you remember the

9

1    Faith Center Evangelistic Ministries?

2         A.    Yes.

3         Q.    And do you remember their first meeting that

4    they held at Antioch library?

5         A.    Yes.  I mean, certain things I remember.

6         Q.    You remember the event happening?

7         A.    Yes.

8         Q.    Do you remember if their meeting violated the

9    meeting room use policy that was in effect at that time?

10             MR. GEIGER:  Objection, lack of foundation.

11    You haven't established which one was in effect.  Strike

12    that.  Never mind.

13             THE WITNESS:  So answer it?

14             MR. GEIGER:  Go ahead.

15             THE WITNESS:  Okay.  All right.  So it was

16    questionable in my mind whether they -- this is just in

17    my mind -- whether or not they were violating rules.

18    One of the things that they might have been violating,

19    or they were, is it did get loud enough so that outside

20    of the walls it could be heard, such as it was heard in

21    our lunch room, which is right off the library, I mean,

22    which is right off the meeting room.  So at one point I

23    remember opening the door and asking them, you know, I'm

24    like, "Shh, keep it down," trying to be nice, but

25    getting the point across that they need to keep it down.

Merrill Legal Solutions
(800) 869-9132

1    So . . .

2            MR. CHANDLER:   Q.   Was there a concern about

3    the religious nature of the meeting?

4            MR. GEIGER:   Objection, vague.   "Was there a

5    concern" is vague.

6            MR. CHANDLER:   Q.   Do you recall if the Faith

7    Center meeting was religious in nature?

8        A.   Well, we heard statements something like,

9    "Praise Jesus," or, "Praise the lord," or some sort of

10    statement like that that was made.   And that was

11    overheard.   And whether or not it was me that overheard

12    it, I don't remember that part.   I don't remember if it

13    was my co-worker or me that overheard that, but I

14    remember, I think that that was one of the concerns, so

15    that the employees were wondering whether or not it was

16    being used for religious purposes.

17        Q.   And --

18        A.   The meeting room.

19        Q.   Could the meeting room be used for religious

20    purposes at that time?

21        A.   No.

22        Q.   And you said earlier that you had overheard it

23    in the, in your lunch room, correct?

24        A.   Yes.

25        Q.   Was that -- is that the staff room in the

1    library?

2         A.    Yes.   There's like a little kitchenette, and

3    then off of the kitchenette that divides the meeting

4    room from the staff room.

5         Q.    Do you remember if you could hear the meeting,

6    the Faith Center meeting from anywhere else in the

7    library?

8         A.    I remember that -- going out in the lobby to

9    see if we could hear them; whether or not we could or

10   couldn't, I don't remember that part.  But I do remember

11   going out in the lobby to see if it could be heard from

12   the lobby.  I remember from the circulation desk area my

13   recollection is we couldn't hear it from there.

14             MR. CHANDLER:   Okay.  Can you show her

15   Exhibit 13.

16             THE WITNESS:   This is just my recollection,

17   okay.  This was a long time ago.

18             MR. CHANDLER:   Q.   I completely understand.

19        A.    The circulation desk is, is right there

20   (Witness indicates).

21        Q.    Would you mark on Exhibit 13 where the desk

22   is?

23             MR. GEIGER:   Before you mark, is that --

24   somebody else has marked that, a different witness

25   marked that.  Are we going to be able to distinguish

                                                        12

1    what we're marking?  Maybe a different color pen would

2    be good.

3             MR. CHANDLER:  Q.  And why don't you write the

4    letter "CD" for "Circulation Desk" on the Exhibit 13 to

5    mark where you're indicating that the circulation desk

6    was.  And if you would take a look at Exhibit 13 and

7    make sure that that is, to the best of your

8    recollection, an accurate depiction of the layout of the

9    Antioch library.

10           A.    Yes.

11           MR. CHANDLER:  Okay.  And so for the record,

12   Miss Biglow has written the letters "CD" on Exhibit 13

13   to indicate where the circulation desk was.

14           Q.    And from that point, could you hear the Faith

15   Center meeting?

16           A.    My recollection says no.

17           Q.    Okay.  Do you recall hearing anything else

18   that was going on during the Faith Center meeting on

19   that day when they held their first meeting at the

20   Antioch library?

21           A.    No.

22           Q.    Do you remember if they were singing?

23           A.    No.

24           Q.    Do you remember if somebody was up talking to

25   an audience?

1      A.   Yes.  I do remember it looked like -- and

2   again, this is just my recollection, because it was so

3   long ago -- but if I remember correctly, one person was

4   at the front of the room facing the rest of the people

5   who were, like, listening to her.  In other words, they

6   were, like, in rows of chairs, and then there was one

7   person in the front, and the people who were in rows of

8   chairs were facing the person in the front, if I

9   remember right.

10      Q.   Do you remember who it was that was in the

11   front speaking?

12      A.   It was, I believe, the same, one of the same

13   two women that we spoke to after, because I opened the

14   door to tell them to be quiet, and that's what I

15   remember.

16      Q.   Was that Pastor Hattie Hopkins?

17      A.   I don't remember who it was.

18      Q.   Okay.  Do you remember if the woman -- it was

19   a woman, correct?

20      A.   Yes.

21      Q.   Do you remember if the woman was discussing

22   the Bible?

23      A.   No.

24      Q.   No, you don't remember, or no, she wasn't

25   discussing the Bible?

1      A.   No, she wasn't discussing the Bible.  I mean,

2   not -- I'm in there for a split second, just to tell

3   them to be quiet, you know.

4      Q.   And that's -- if you don't remember what she

5   said, that's fine.  I just -- if you can remember

6   anything about --

7      A.   No, I don't remember any specifics of her

8   talking about the Bible.

9      Q.   Other than you asking them to be quiet the

10   time that you mentioned, did you have any other

11   conversations with anybody from Faith Center that day?

12      A.   Yes.  It was with the two women after, it was

13   Lisa and I, Lisa Loomis and I who spoke with them in

14   regard to the fact that it was okay for them to finish

15   their meeting this time, but based on the fact that it

16   appeared the room was being used for religious purposes,

17   that they wouldn't be allowed to use it in the future.

18   And we got that instruction, I believe, from our

19   supervisor, because we called our supervisor when Lisa

20   came to me and told me that she heard this going on.

21   And I believe RC was there, too, and I think RC was kind

22   of like, Well, what should we do?  You know, we were

23   kind of like, Well, what do we do about it?  And then I

24   remember calling Patty, who was our supervisor, because

25   she wasn't there, to ask her about that.

Q.   When you say RC, who is that?

A.   I think it's her -- well, RC is her name, but I think her real name is Ruth, Ruth something.

Q.   And --

A.   We call her RC.

Q.   And did you call Patty or did --

A.   Yes.  It was me that called her.

Q.   And what did you tell her?

A.   Basically, that Lisa was concerned, that she had heard religious content.  And I don't remember if it was me or her that had heard, you know, like, "Praise the lord," or "Praise Jesus" or something to that effect.  And it was pretty loud.  And, you know, what should we do about this?  The meeting's going on, and . . . I do remember -- now, see, I remember going around to the lobby area to see if we could hear them. Now, whether or not we could hear them, I don't really recall.  So I'm sure I had probably told Patty about that, too.  Patty's our supervisor, and I just remember Patty saying, Well, let them finish their meeting, and when their meeting is done, then just let them know in the future that it can't be used for religious purposes.

Q.   Okay.  And what -- when you went to speak with Pastor Hopkins, was that during the meeting?  Or was it -- did you wait until the meeting was over?

16

1          A.    No, it was during the meeting.

2          Q.    And where did you have your conversation?

3          A.    In the lunch room.

4          Q.    And do you recall what you or -- what you or

5     Lisa -- I went blank on Lisa's name, I apologize -- what

6     you or Lisa said to Pastor Hopkins?

7                MR. GEIGER:  Objection, calls for hearsay.

8                MR. CHANDLER:  Q.  You can go ahead and

9     answer.

10               MR. GEIGER:  Go ahead.

11               THE WITNESS:  Oh.  Again, this is just my

12    recollection, something to the effect that, you know,

13    because of -- you know, We allowed you to finish the

14    meeting today, but, you know, it got kind of loud and,

15    you know, the meeting room's not supposed to be used for

16    religious purposes.  And because of that, they would be

17    allowed to use it this one time, but in the future they

18    wouldn't be able to use it.

19               MR. CHANDLER:  Q.  Okay.  After you spoke with

20    Pastor Hopkins and the other woman, did you talk to

21    anybody else at the library about the Faith Center

22    meeting?

23         A.    Well, kind of like everybody was involved, I

24    mean, by this point, you know.  People were, you know,

25    like, "So what happened?"  You know, that normal stuff.

                                                          17

1      Q.    Did you talk to Patty Chan again about it?

2      A.    I'm sure I must have.  I mean, I don't think

3   that we just did that, and then -- you know, I'm sure

4   Patty inquired as to, well, what happened.

5           MR. GEIGER:   Just make sure to answer when

6   there's a question, not speculate.

7           THE WITNESS:   Oh.  I'm sure, yes, we must have

8   talked after.

9           MR. CHANDLER:  Q.  Do you remember anything

10  that you said to her about it?

11     A.    No.

12     Q.    When did you -- do you remember the

13  approximate date that you stopped working at the Antioch

14  library?

15     A.    I believe it was June 2005.

16     Q.    So after that first meeting that the Faith

17  Center had up until you left Antioch library, did Faith

18  Center have any additional meetings at the library?

19     A.    Yes.

20     Q.    Were you present at the library when those

21  meetings took place?

22     A.    Well, I work every Saturday, and did at that

23  time, so more than likely yes.

24     Q.    Did you ever overhear any of those meetings?

25     A.    No.

18

1          Q.    Did you ever have any other conversations with

2    Pastor Hopkins or anybody else from Faith Center?

3          A.    No.

4          Q.    Do you know anything, know of anything that

5    they did during those meetings?

6                MR. GEIGER:   Objection, vague.

7                MR. CHANDLER:   Q.   You can go ahead and

8    answer.

9          A.    No, because I wasn't checking in on them, and

10   they were quiet enough.

11         Q.    So there weren't any other noise problems with

12   them either?

13         A.    No.

14         Q.    Apart from that, the first meeting that Faith

15   Center had, have you ever had to enforce the meeting

16   room use policy against another group that was using the

17   meeting room?

18         A.    No.   Well, I shouldn't say no.   Not that I

19   remember.   More than likely yes.   I can't imagine that I

20   didn't, but I don't remember.   This one I remember.

21         Q.    Have you ever heard or encountered another

22   religious meeting taking place in one of the meeting

23   rooms?

24                MR. GEIGER:   Objection, vague and compound.

25                MR. CHANDLER:   Q.   You can answer.

1          MR. GEIGER:  Go ahead.

2          THE WITNESS:  Well, AA meetings involve

3   prayer, and so do NA meetings, and I know that we used

4   to have NA meetings there.  In fact, I attended a couple

5   of those.  I can't remember if we ever had AA, but I

6   know we had NA.  And it, it involves prayer.

7          MR. CHANDLER:  Q.  When you say "NA," what are

8   you referring to?

9      A.   Oh.  Narcotics Anonymous.

10     Q.   And did they, did they meet at the Antioch

11  meeting room?

12     A.   On Sundays.

13     Q.   Okay.  And can you describe one of those

14  meetings for me, what, what -- or I guess how many

15  meetings did you go to?

16     A.   Two that I remember.

17     Q.   And did they follow a similar pattern those

18  two meetings?

19     A.   Yes.

20     Q.   Could you describe that pattern for me?

21     A.   You would open, or, you know, open with some

22  readings out of the big book, or the Narcotics Anonymous

23  book, and then, you know, they would have their promises

24  and their -- what is it called -- promises and the

25  something else.  And then you would always open with a

1   prayer, and then they would have either a speaker that
2   would come up and talk about their experience and then
3   their, you know, turnaround, how they've gotten better
4   and how they're doing today.  And then it was open
5   discussion and people could just, you know, talk about
6   the 12 steps, and of course the 12 steps do entail
7   spirituality and god.  And then we would pray in the
8   end.  We would start with prayer and end with a prayer.
9       Q.   And --
10      A.   Joining hands.
11      Q.   You mentioned the big book.  Could you -- I'm
12  not familiar with it.  Could you describe it a little
13  bit to me?
14      A.   Oh, well, there's an Alcoholics Anonymous book
15  and then there's a Narcotics Anonymous book, and
16  basically, they're the same until you start getting to
17  the personal stories.  Narcotics Anonymous deals with
18  drugs and alcohol.  Alcoholics Anonymous just strictly
19  deals with drugs, I mean, alcohol.  And, you know, it
20  just, it's almost kind of like, it's like a reference
21  book for people who are trying to get sober.
22      Q.   Does it discuss god or --
23      A.   Yes.
24      Q.   -- spirituality?
25      A.   Yes.

1       Q.   Do you recall anything that, any specific

2   instruction or, that it provides about spiritual issues?

3       A.   Well, like the first step is that you have to

4   admit you're powerless.  The second step is no one can

5   relieve your sanity except for god.  And then the third

6   step is that you are willing to accept God to relieve

7   you of your addiction, basically.  And then the fourth

8   and fifth steps are about writing your resentments down.

9   And then it's about coming, becoming willing to ask god

10  to remove your defects.  And then it is actually asking

11  god to remove your defects, which that's 6, 7.  Then 8

12  is about writing down all the people you've harmed, and

13  9 is going to them and making amends.  And 10 is to take

14  constant spiritual inventory, and 11 is to share it with

15  others, and 12 is to practice these principles in

16  everyday life.

17      Q.   So the Narcotics Anonymous meetings then had a

18  religious component to them, you'd say?

19      A.   Yes, definitely.

20      Q.   And did you attend those meetings during the

21  time that you were working in the Antioch library, was

22  it in the same --

23      A.   Yes.

24      Q.   Have you attended any other private meetings

25  that were conducted in the Antioch meeting room?

```
 1        A.    Just Friends of the Library meetings.

 2        Q.    Can you show her Exhibit 4, please.

 3              Can you just take a look at Exhibit 4 and tell

 4   me if you recognize it.

 5        A.    Yeah, uh-huh.

 6        Q.    What is it?

 7        A.    It's the building use rules, basically.

 8        Q.    Is this for the entire building or just for

 9   the meeting room?

10        A.    For the meeting room.

11        Q.    And is this, to your knowledge, the current

12   policy that's in place for Contra Costa County

13   libraries?

14        A.    Yes.

15        Q.    Is this policy in effect at the library branch

16   that you currently work at?

17        A.    Yes.

18        Q.    Can you take a look at the religious use

19   aspect of the policy.

20        A.    Uh-huh.

21        Q.    The policy currently prohibits all religious

22   services, correct?

23        A.    Correct.

24              MR. GEIGER:   Objection, the document speaks

25   for itself.
```

23

1          MR. CHANDLER:   Q.   To your knowledge, is the

2    term "religious service" defined in any library policy?

3          MR. GEIGER:   Objection, relevance.

4          Go ahead.

5          THE WITNESS:   Not that I'm aware of, no.

6          MR. CHANDLER:   Q.   Have you ever received any

7    guidance or instruction from a supervisor as to what a

8    religious service is?

9       A.   No.

10         MR. GEIGER:   Objection, relevance.

11         THE WITNESS:   Oh, sorry.   No.

12         MR. CHANDLER:   Q.   How would you define

13   "religious service"?

14         MR. GEIGER:   Objection, relevance.

15         Go ahead.

16         THE WITNESS:   I describe a religious service

17   as something basically that is called that.   Usually a

18   religious service starts with songs to god, and then

19   there's usually a pastor that gets up and talks about,

20   you know, the Bible or their message that they want the

21   people to know.   Usually an offering is taken.   Usually

22   there's some sort of ritualistic thing that is

23   indicative of that particular religion, such as if

24   you're Catholic you're going to have communion.

25   There's, you know, a lot of prayer throughout the

1  service.  And the congregation, with the exception of

2  singing, doesn't participate back.  It's not like a

3  two-way thing going on.  It's more like the congregation

4  stays quiet and listens to everybody who is in the

5  front, but the congregation participates in song.

6  That's what I think of as religious service.

7          MR. CHANDLER:  Q.  So if there was an event

8  going on in the library that had prayer involved, would

9  you, would you view that as a religious service under

10  the, under the meeting room use policy?

11          MR. GEIGER:  Objection; relevance, calls for

12  speculation.

13          Go ahead.

14          THE WITNESS:  Not based on Narcotics Anonymous

15  meetings.

16          MR. CHANDLER:  Q.  Okay.  If, if somebody was

17  having a meeting where they were giving a sermon,

18  standing up and preaching about the Bible in the meeting

19  room at a Contra Costa County library, would you

20  consider that a religious service under the meeting room

21  use policy?

22          MR. GEIGER:  Objection, calls for speculation.

23          Go ahead.

24          THE WITNESS:  I would say that it would

25  depend.  Does the rest of the congregation get to come

25

1    up and speak about their, you know, experience, or -- a

2    meeting to me is when everybody gets together and

3    there's input from all sides.  If it's a person that

4    just gets up in front and says a sermon and there's not

5    input from all peoples involved, it's no longer a

6    meeting, to me.

7            MR. CHANDLER:  Q.  What has it become?

8        A.    Then it becomes to me a service, like a

9    religious service.

10       Q.    So if you saw that kind of event going on in

11   the library meeting room, would you, would you stop it

12   the way you did with Faith Center?

13           MR. GEIGER:  Objection, calls for speculation.

14           Go ahead.

15           THE WITNESS:  Yes, if I was aware that that

16   was the format that they were using.

17           MR. CHANDLER:  Q.  If a financial organization

18   wanted to come and give a presentation on how to manage

19   your money, would that be allowed under the meeting room

20   use policy?

21       A.    If it's nonprofit, it would be.  But even with

22   that, I believe that there's a lot of participation from

23   the people who come, you know, there's always -- usually

24   with a presentation the people who are there are allowed

25   to ask questions and it becomes a communication.  Maybe

26

1    it might begin with a presentation, but it's not a

2    presentation the whole entire time.

3         Q.   So do you review or, all of the meetings that

4    take place in the meeting room to make sure that they

5    are, allow for everyone to get involved and speak out?

6              MR. GEIGER:  Objection, vague.

7              THE WITNESS:  I don't -- and not only that, I

8    don't -- that's not my job.  I don't review the meeting

9    room applications.

10             MR. CHANDLER:  Q.  But when the -- excuse me.

11   When the meetings are going on in the library, do you

12   ever check to make sure that they're not just giving a

13   presentation but allowing everybody to, to participate?

14        A.   No, I don't.

15        Q.   Do you have any -- to your knowledge, are

16   there any religious meetings taken place at the Moraga

17   library since you started working there?

18        A.   To my knowledge, no.

19        Q.   To your knowledge, has anybody that has asked

20   to use a meeting room either at the Moraga library while

21   you were there, or at the Antioch library, been denied

22   access to the meeting room other than Faith Center?

23        A.   For religious purposes?

24        Q.   For any purpose.

25        A.   Oh.  I don't -- no -- see, I don't -- that's

27

1    not in my job description.  So I never know what is

2    denied and what is, what is okay.

3          Q.    So just to your knowledge --

4          A.    To my knowledge --

5          Q.    -- are you aware of any?

6          A.    -- no.

7          MR. CHANDLER:  Okay.  I do not have any other

8    questions.

9          MR. GEIGER:  I don't have any questions.

10          (Whereupon, the deposition was

11          adjourned at 9:44 a.m.)

12                          --oOo--

13          I declare under penalty of perjury that the

14    foregoing is true and correct.  Subscribed at

15    _____, California, this _____ day of

16    _____, 2008.

17

18

19                              _____

20                              JENNA BIGLOW

21

22

23

24

25

                                                              28

CERTIFICATE OF REPORTER

I, CAROLYN M. MANN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: _July 31st, 2008_

_[signature]_

CAROLYN M. MANN, CSR No. 10066